**HAGGAR APPAREL COMPANY,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 93–06–00343.
Slip Op. 96–110.

United States Court of International Trade.

July 12, 1996.

Sandler, Travis, & Rosenberg, Miami, FL (Gilbert Lee Sandler, Edward M. Joffe and Arthur K. Purcell), for plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, DC, Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York City (Saul Davis), Washington, DC, for defendant.

**OPINION AND JUDGMENT ORDER**

DiCARLO, Chief Judge:

Plaintiff, Haggar Apparel Company challenges the denial of protests filed pursuant to section 515 of the Tariff Act of 1930, 19 U.S.C. § 1515 (1988). Haggar contends the United States Customs Service erroneously

denied a duty allowance for fabric components manufactured in the United States and shipped to Mexico for assembly into men's pants. Jurisdiction is proper under 28 U.S.C. § 1581(a) (1988). The court finds the merchandise in question is entitled to a duty allowance.

## BACKGROUND

The imported merchandise consists of men's pants assembled in Mexico from components manufactured in the United States. (Stip. Facts ¶¶ 9, 43.) Haggar markets these pants under the "Presstige" name. The most important performance characteristics of Presstige pants are crease retention and seam and surface flatness; the pants are "wash and wear" garments. (Tr. at 11–12, 40; Stip. Facts ¶¶ 18–19.)

Haggar achieves its performance requirements by using a "pre-cured," "post-cured," or pure synthetic fabric. (Stip. Facts ¶ 18.) Curing involves the application of heat to fabric treated with resin. Under the pre-cured method, resin and heat are both applied at the textile mill; Haggar purchases the fabric, cuts it to shape, assembles the components, and presses the completed garment. (Stip. Facts ¶ 20; Tr. at 12.) Under the post-cured approach, Haggar purchases resin-treated fabric from the mill, cuts, assembles, and presses the garment, and bakes it in a curing oven. *Id.* Both the pre-cured and post-cured methods use fabric of a cotton-synthetic blend, which is typically sixty percent cotton and forty percent polyester. (Stip. Facts ¶ 9; Tr. at 12.) Presstige pants made from a pure synthetic fabric require pressing, but do not require resin treatment or baking. (Tr. at 43.)

All methods for producing Presstige pants involve the same assembly and pressing process. *Id.* at 13. The only difference occurs after pressing. *Id.* In the post-cured method, the pants are loaded on an oven conveyer, baked, and unloaded from the conveyer. Improper pressing of the garment prior to the baking process will result in the product being sold as a "second," as proper pressing is essential to crease retention and surface flatness. (Stip. Facts ¶ 41.) In addition, a crease defect cannot be reversed after oven-baking. *Id.*

The garments at issue are Model 245 Presstige pants imported by Haggar in 1988 and 1989. (Stip. Facts ¶ 36; Haggar's Customs Protest at 3–4.) These pants were made from fabric style 2010, which is a post-cured fabric comprised of sixty percent combed cotton and forty percent fortrel polyester. (Stip. Facts ¶ 39.) The fabric and other components, such as buttons, thread, zippers, and trim items, were manufactured in the United States. *Id.* ¶¶ 47–50. Haggar cut the resin-treated fabric to shape, and exported the fabric and remaining components to Mexico, where they were assembled into pants by Haggar's wholly owned subsidiary, Haggarmex. *Id.* ¶¶ 9, 43–52. Following assembly, pressing, and baking, Haggar attached hangtags and tickets to the pants and packaged and shipped them to the United States. (*Id.* ¶ 52; Tr. at 153–154.)

Upon importation, Haggar sought a duty allowance for pre–1989 entries under item 807.00 of the Tariff Schedule of the United States [hereinafter "TSUS"], and for the remaining entries under subheading 9802.00.80 of the Harmonized Tariff Schedule of the United States [hereinafter "HTSUS"]. Item 807.00, Subpart B, Part I, Schedule 8, TSUS (1987); Subheading 9802.00.80, Chapter 98, Section XXII, HTSUS (1987) (implemented into law on Jan. 1, 1989, pursuant to 19 U.S.C. § 3004 (1988)). Customs denied a duty allowance for the post-cured, cut-to-shape fabric components, but granted the duty allowance for all other components produced in the United States. For the post-cured fabric Customs assessed duties at the rate of 16.5 percent *ad valorem* under TSUS item 381.62.40, and 17.7 percent *ad valorem* under HTSUS subheading 6203.42.40. (Stip. Facts ¶ 11.)

## DISCUSSION

Customs is entitled to a presumption of correctness as to its factual determinations. *See* 28 U.S.C. § 2639(a)(1) (1988) (presumption); *see also Goodman Mfg., L.P. v. United States,* 69 F.3d 505, 508 (Fed.Cir.1995) (limiting presumption to factual determinations). Plaintiff bears the burden of proving that

Customs' determination is incorrect. 28 U.S.C. § 2639(a)(1).

Item 807.00(c) of the TSUS affords domestic goods exported for purposes of assembly a partial duty allowance upon re-entry into the United States. To qualify under item 807.00(c), fabricated components of the United States assembled abroad must not be advanced in value abroad outside of assembly and operations incidental to the assembly process. Item 807.00(c), TSUS. Item 807.00 provides:

> 807.00 Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

Item 807.00, TSUS. Pursuant to item 807.00, Customs assesses a duty upon eligible merchandise based "upon the full value of the imported article, less the cost or value of such products of the United States." *Id.* The HTSUS provides an identical exemption under Subheading 9802.00.80.

The parties do not challenge that the imported merchandise was advanced in value or improved in condition abroad. Further, they agree that the articles were exported in condition ready for assembly without further fabrication and that the articles have not lost their physical identity. (Stip. Facts ¶¶ 44–45.) Therefore in determining whether the components qualify for an item 807.00 trade allowance, the dispositive issue is whether ovenbaking is an operation incidental to assembly. To answer this question, the court turns to the Federal Circuit's decision in *United States v. Mast Industries, Inc.,* 668 F.2d 501 (C.C.P.A.1981).

## I.  The Mast Factors

To determine whether button-holing and pocket-slitting operations were incidental to assembly of women's pants, the court in *United States v. Mast* examined the following factors:

> (1) Whether the cost of the operation relative to the cost of the affected component and the time required by the operation relative to the time required for assembly of the whole article were such that the operation may be considered "minor."

> (2) Whether the operations in question were necessary to the assembly process. . . .

> (3) Whether the operations were so related to assembly that they were logically performed during assembly.

*Mast,* 668 F.2d at 506. The *Mast* court also indicated a fourth consideration: "whether economic or other practical considerations dictate that the operations be performed concurrently with assembly." *Id.* at n. 7. These factors are not exhaustive, and all factors may not be relevant in each case. *General Motors Corp. v. United States,* 976 F.2d 716, 719–20 (Fed.Cir.1992). Nonetheless, the most basic question—whether such operations are of a minor nature incidental to the assembly process—remains the focus of the court's inquiry.

### (A)  Cost Comparisons

The first prong of the *Mast* comparisons examines whether the challenged operation constitutes a significant proportion of the total assembly process. To make this determination, the court must first define the scope of the challenged operation, because in making the cost determination, the court must weigh the expense and time costs of the challenged operation against the cost of assembly. According to plaintiff, the court should compare only ovenbaking against total assembly costs. (Haggar's Post Trial Br. at 1–2.)

Defendant argues the court must compare all non-assembly costs against only pure assembly expenses. (Def.'s Post Trial Br. at 2–3.) To accomplish this task, defendant first contends that operations included on the assembly side of the *Mast* comparisons are solely those operations which encompass the joinder of two solids. *Id.* at 16 & n. 10. Defendant argues that, at a minimum, the

court must exclude *all* non-joinder operations, including minor chopping and trimming operations, from the assembly side of the *Mast* comparisons. *Id.* at 16–17.

Second, defendant contends the court must combine *all* non-joinder operations which were excluded from the assembly side of the *Mast* comparisons for comparison against pure assembly costs in order to ascertain whether the challenged operations were more than minor improvements, and therefore, not incidental to assembly. *Id.* According to defendant, failing to combine all non-joinder costs for comparison against pure assembly costs would result in a piecemeal analysis that would undermine "item 807.00 by allowing major and significant operations to be broken down to [a] point where each step could be called minor." *Id.* at 17 (quoting *General Motors,* 976 F.2d at 720). Defendant contends this court in *Surgikos, Inc. v. United States,* 12 Ct. Int'l Trade 242, 245, 1988 WL 24664 (1988) similarly combined all non-assembly operations for comparison against pure assembly operations in determining whether the challenged operations were minor and, therefore, incidental to assembly. *Id.* at 17–18.

The court disagrees with defendant's readings of *General Motors* and *Surgikos.* Neither decision demands that *all* non-joinder operations must be combined for comparison against only pure assembly functions. The Federal Circuit in *General Motors* disagreed with the lower court's "piecemeal analysis" because the lower court improperly sought to separate the various components of a single process—coating operations during automobile assembly—that should have been considered together. 976 F.2d at 720. The Federal Circuit determined that isolating the various components of the coating operation for an item 807.00 allowance would have allowed importers to argue that each component of the challenged operation was minor, even though the operation as a whole was a significant process, and therefore not incidental to assembly. *Id.* *General Motors,* however, did not mandate combining *all* "non-joinder" functions with the coating operations when comparing expense and time costs against the cost of the affected compo-

nents, and the duration of assembly, as defendant now urges. If this were the case, the Federal Circuit would have also grouped the other non-joinder processes including water testing, detail work, inspections, wheel alignment, and final drive tests with the coating operations in its *Mast* calculations. *See id.* at 717–18 (listing non-assembly operations).

*Surgikos* also fails to support defendant's position. *Surgikos* concerned the assembly of surgical sheets assembled in Mexico. Although the court in *Surgikos* did weigh the only two nonassembly operations—fenestration (creating a rectangular opening in the sheet) and finish folding (functional folding to maintain antiseptic conditions)—against the pure joinder operations, Customs had challenged *both* fenestration and finish folding as nonincidental to assembly; the joinder of the surgical sheets was the only remaining operation. 12 Ct. Int'l Trade at 243–44. Customs, by challenging *all* nonassembly operations as not being incidental to assembly, necessarily mandated that the court compare all nonassembly operations against pure assembly. The issue of whether all nonassembly operations must be weighed against pure assembly, however, was not before the court. The court therefore does not read *Surgikos* as broadly as defendant urges.

■ The court finds that the minor chopping, handling and trimming operations are not merely incidental to assembly, but are so integral to the process as to merge with it. (*See* Court's Findings, Tr. at 511) (noting that such processes are related to assembly and may also be part of assembly); *see also General Instrument Corp. v. United States,* 499 F.2d 1318, 1319–21 (C.C.P.A.1974) (finding spooling, shaping & machine pressing, cement coating, cutting, stripping, and weaving of magnet and lead wire exported from the United States to Taiwan where wire was wound into coils and cable harnesses as constituting assembly for purposes of item 807.00). These minor operations include placing a notch into the zipper to facilitate the next assembly step, minor trimming of loose threads, simultaneous sewing and cutting of the fly lining, the cutting apart of bands (fabric belt encircling waist) & separa-

tion of excessive band lining, the sorting and placing of belt loop components together on a crimping machine to bond the components together, as well as certain supply and handling operations and various manipulations of the fabric so as to make further assembly more efficient. (Tr. at 128–40.) The court, therefore, rejects defendant's interpretation of assembly as purely the joinder of two components as overly restrictive.

■ The question remains whether pressing is part of the challenged operation compared against assembly. Haggar contends that the challenged operation consists solely of ovenbaking. (Haggar's Post Trial Br. at 1–2; Haggar's Post Trial Reply Br. at 9.) According to Haggar, pressing could not be part of the challenged operation because Customs has considered pressing by itself to be minor and incidental to assembly under item 807.00. *Id.* at 11. However, pressing is necessary to further the curing process. (*See* Stip. Facts ¶ 42) ("the post-curing process used on the [pants in issue] was achieved by pressing and ovenbaking.") Although in a strict sense, pressing is not part of curing, as the actual heat-induced transformation of the fabric is performed during oven-baking, pressing is integrally related to Haggar's purpose in conducting the curing process, namely to develop crease retention and greater surface and seam flatness in its garments. (Stip. Facts ¶ 19; Tr. at 44.)

This decision is consistent with the decision of the Federal Circuit in *General Motors.* In *General Motors,* the Federal Circuit rejected the lower court's delineation of the challenged painting operation as too narrow, finding "that all coating operations performed upon the disputed components ... must be considered in conjunction with topcoat painting operations to determine if coating operations, collectively, are minor incidents to assembly." 976 F.2d at 720.

The pressing operation, like the coating operations in *General Motors,* did not interfere with item 807.00's prescriptions when performed in isolation. However, when performed prior to ovenbaking, pressing does more than simply impart a temporary smoothness to the fabric. It begins the curing process which, once started, imparts permanent new characteristics to the pants. Thus, the entire curing operation in this case is analogous to the entire finish painting operation in *General Motors;* the court must consider ovenbaking in conjunction with pressing when applying the *Mast* test.

Application of the first *Mast* factor involves comparing (1) the cost of the curing operation relative to the cost of the post-cured fabric component, including, pursuant to *General Motors,* the comparison of Haggar's investment in the curing operation versus its investment in the assembly process; and (2) the time required for curing, relative to the time required for assembly. *General Motors,* 976 F.2d at 719–21.

### (i) Cost Comparisons of Curing Relative to the Cost of the Affected Components, and to the Cost of the Assembly Process

■ Dividing the cost of pressing and baking ($0.0529) by the cost of the fabric components ($3.08) indicates the curing operation constitutes 1.72 percent of the component cost.[1] (Joint Stip. at 2–3.) Further, comparing the cost of curing (again pressing and ovenbaking, $0.0529) against the total operation cost ($0.500) constitutes 10.6 percent. *Id.* The court does not find either figure significant. *See Mast,* 668 F.2d at 506 (finding 15% minor [$0.003 of $0.020 in percentage terms]).

### (ii) Capital Investment Comparisons

The court in *General Motors* also found a capital investment determination relevant to the cost analysis. 976 F.2d at 721. Defendant argues that proper analysis under this

---

1. The parties stipulated that overhead costs of "factory supplies, pressing expense, H & O repair, H & O repair parts, porters, office security guard, boiler maintenance, cook, legal, doctor, severance pay, unemployment, insurance (unemployment and insurance are two separate parts), dues and subscription, telephone, employee ben-

efits, other professional fees, office supplies, janitor supplies, travel, auto expense[s], advertising and building maintenance cannot be allocated to the pants at issue," or to a division of assembly versus nonassembly costs. (Parties' Stip., Tr. at 535.) The court therefore makes *Mast* cost comparisons exclusive of overhead.

factor requires the use of replacement costs, as supplied by the parties in their cost stipulations. (Def.'s Post Trial Br. at 21, 39.) According to defendant, if the court instead were to use depreciated costs, the qualification for a duty allowance would vary by the year the merchandise in question would be imported, or by the age of the equipment used on the imported merchandise. *Id.* at 21. Thus similarly-positioned importers might receive disparate treatment for the same operation.

Plaintiff argues depreciation costs are proper. (Haggar's Post Trial Reply Br. at 19, 20.) Plaintiff argues Customs' practice has been to permit depreciation of the machinery, as in accordance with generally accepted accounting procedures. (Haggar's Post Trial Br. at 10.) According to plaintiff, the investment cost of the ovens was zero, as the ovens were 25 years old and fully depreciated when they were transferred to Mexico. *Id.* Permitting depreciation, the only remaining equipment for comparison would be the pressing equipment ($430,000), which would constitute 50 percent of assembly capital costs ($857,724). (Joint Stip. at 4) (total capital costs minus pressing & ovenbaking). If the court did not permit the depreciation of the oven to zero, the capital investment of the curing equipment would be $522,808, or 61 percent of the assembly capital costs. *Id.* The court cannot consider either of these figures as minor and finds that these factors weigh against granting a duty allowance under item 807.00.

### (iii) Time Comparisons

The Federal Circuit in *General Motors* found "where operations ... involve significantly automated or non-labor processes (*such as baking*), this factor provides little guidance on whether operations are of a 'minor nature.'" 976 F.2d at 720 (emphasis added). Ovenbaking is an automatic process which accounts for nearly one-third of the total operation time. (Revised Joint Stip. at 1) (dividing 15 minutes ovenbaking time by 42 minutes for total operation). The court, pursuant to *General Motors,* does not address this test here.

### (B) Necessity and Logical Relatedness to Assembly

*Mast* factors 2 and 3 examine respectively whether the challenged operations were so related to assembly that they were necessary to the assembly process, and whether the challenged operations were so related to assembly as to be performed during assembly. *Mast,* 668 F.2d at 506.

The parties have stipulated that "[t]he effect of ovenbaking is to create crease retention and greater surface and seam flatness in the garment, and prevent wrinkling." (Stip. Facts ¶ 55.) These features are unrelated to assembly. The parties in fact have agreed that assembly occurs without the initiation of the curing process—pressing—so it follows the entire curing operation would be similarly unnecessary. (Stip. Facts ¶ 38.) The court finds that ovenbaking and pressing are not necessary, nor related to assembly. (Court's Findings, Tr. at 455, 503, 505–506.)

### (C) Economic & Other Practical Considerations

The fourth *Mast* factor examines whether economic and practical considerations dictate that the challenged operations be performed concurrently with assembly. 668 F.2d at 506 n. 7.

Defendant argues that plaintiff cannot present any considerations requiring that curing be conducted concurrently with assembly, because curing does not begin until after assembly is completed. (Def.'s Post Trial Br. at 41–42.) According to defendant, *Mast* and its progeny demonstrate that "concurrently" with assembly only extends to actual joinder. *Id.* at 16 n. 10, 41–42.

The court does not agree with defendant's narrow interpretation of "concurrently." This restrictive interpretation would, in effect, require a showing that ovenbaking must be done during assembly because it is necessary to further assembly. However, this inquiry is already accomplished by the necessity requirement in *Mast.* The legislative history of item 807.00 demonstrates clear Congressional intent to permit duty-free treatment of a component manufactured in the United States if subjected to an oper-

ation "of a minor nature incidental to the assembly process, whether done before, during or after assembly." *Tariff Schedules Technical Amendments Act of 1965*, H.R.Rep. No. 342, 89th Cong., 1st Sess. 49 (1965).

The parties agree that, if the pants were packed and shipped to the United States immediately after assembly, but before curing, Haggar would incur additional costs for repacking and reshipping to the distribution centers. (Parties' Stip., Tr. at 545.) Moreover, an additional work shift would have to be added to complete the ovenbaking and pressing at higher labor costs. *Id.* at 547. Mr. Ernie Ramirez, International Accounting Manager for Haggar, also testified that "throughput" time (total time from when the garment is cut to when it is received by the customer) would be increased by 3–4 days, and separating ovenbaking from assembly would result in higher transportation costs, increased production times, the need for additional facility investment, higher handling costs, and additional overhead expenses. (Tr. at 347, 399–402.) Finally, Mr. Frank Bracken, President of Haggar Apparel Co., testified that post-curing immediately after assembly was necessary because there was a risk with post-cured fabric that permanent creases and wrinkles would occur during shipping, and render the product "useless." (Tr. at 39, 49–50.) Although the curing operation does not preclude assembly from occurring, the court finds the curing of the fabric would logically occur at this time to minimize damages and economic costs. The court holds that economics and practicality dictate that Haggar cure its merchandise concurrent with assembly.

The court finds the costs of the curing operation are insignificant as a percentage of the fabricated components and of the entire operation. Moreover, strong economic and practical considerations dictate that curing be performed concurrently with assembly. After balancing the relevant factors, the court finds that the curing operation is "incidental to the assembly process" within the meaning of item 807.00, TSUS, and subheading 9802.00.80, HTSUS.

## II.  Advancement in Value

Defendant argues that, even if the *Mast* analysis results in a finding that the operation is minor, additional inquiry is necessary to determine whether the imported article has undergone a prohibitory advancement in value. (Def.'s Post Trial Br. at 23–26.) Therefore, according to defendant, the court should consider the importance to Haggar of the crease retention and the greater surface and seam flatness as an additional factor. *Id.*

Defendant's arguments are meritless. Item 807.00 provides that a duty allowance is permissible so long as the merchandise in dispute has not been advanced in value "except by operations incidental to the assembly process." Item 807.00(c), TSUS. Item 807.00 does not prohibit an advancement in value, therefore, so long as the operation in question is incidental to assembly.

## III.  19 C.F.R. Section 10.16

Defendant contends 19 C.F.R. § 10.16 (1988) governs the application of item 807.00. Subsection 10.16(c) provides:

> Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article.

19 C.F.R. § 10.16(c) (1988) (1989 version identical).

The court disagrees. Subsection 10.16(c) conflicts with the plain language of item 807.00. Item 807.00 does not prohibit operations which merely *impart new characteristics* to the article being assembled as the regulation provides, but in fact permits a duty allowance for such improvements to the articles so long as the operation imparting those characteristics was incidental to assembly. Moreover, the Federal Circuit has strongly qualified 19 C.F.R. § 10.16, *see Chrysler Corp. v. United States*, 1996 WL 132263 at *2 (Fed.Cir.1996) (finding the cost

comparisons in *General Motors* "determinative" over 19 C.F.R. § 10.16), or has ignored the regulation altogether, *see Mast,* 668 F.2d at 506 (developing factors); *General Motors,* 976 F.2d at 718 (citing, but not applying regulation); *United States v. Oxford Industries, Inc.,* 668 F.2d 507 (C.C.P.A.1981) (applying *Mast* factors only). Indeed, defendant has recognized pursuant to the court's questioning that these decisions have cast considerable doubt on the regulation's validity. (Def.'s Suppl.Br. at 1–2.)

Finally, although defendant argues that Customs is entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), the recent decisions in *Crystal Clear Industries v. United States,* 44 F.3d 1001 (Fed.Cir.1995), and *Anval Nyby Powder AB v. United States,* 927 F.Supp. 463 (Ct. Int'l Trade 1996) may have put defendant's assertion into question. *See Crystal Clear,* 44 F.3d at 1003 (declining to apply *Chevron* deference to Customs in routine classification decisions); *see also Anval Nyby Powder AB,* 927 F.Supp. at 469 (finding "court's statutory obligation to find the correct result limits the court's ability to give special *Chevron* deference" to Customs' statutory constructions.) The court finds the Federal Circuit's test in *General Motors* as determinative.

## CONCLUSION

The court in applying the *Mast* factors finds that the curing operation performed on Haggar's Model 245 Presstige men's pants, fabric style 2010, was a minor operation incidental to the assembly process under item 807.00, TSUS and subheading 9802.00.80, HTSUS. Customs is ordered to allow a duty allowance for the components in issue.

## JUDGMENT ORDER

This action having been submitted for decision, after trial and upon due deliberation, in conformity with the decision rendered, it is hereby

ORDERED that Customs grant a duty allowance under TSUS item 807.00 and HTSUS subheading 9802.00.80, for Haggar's Model 245 men's pants, fabric style 2010; and it is further

ORDERED that the action is dismissed.