## UNITED STATES *v.* HAGGAR APPAREL CO.

No. 97–2044.   Argued January 11, 1999—Decided April 21, 1999

KENNEDY, J., delivered the opinion for a unanimous Court with respect to Parts I, II, and III, and the opinion of the Court with respect to Part IV, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined, *post*, p. 395.

*Kent L. Jones* argued the cause for the United States. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Wallace, William Kanter,* and *Bruce G. Forrest.*

*Carter G. Phillips* argued the cause for respondent. With him on the briefs were *Mark E. Haddad, Ronald W. Gerdes, Gilbert Lee Sandler, Edward M. Joffe,* and *Marc W. Joseph.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

This case concerns regulations relating to the customs classification of certain imported goods. The regulations were issued by the United States Customs Service with approval of the Secretary of the Treasury. The question is whether these regulations, deemed controlling by the Treasury, are entitled to judicial deference in a refund suit brought in the Court of International Trade. Contrary to the position of that court and the Court of Appeals for the Federal Circuit, we hold the regulation in question is subject to the analysis required by *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), and that if it is a reasonable interpretation and implementation of an ambiguous statutory provision, it must be given judicial deference.

I

Respondent Haggar Apparel Co. designs, manufactures, and markets apparel for men. This matter arises from a refund proceeding for duties imposed on men's trousers shipped by respondent to this country from an assembly plant it controlled in Mexico. The fabric had been cut in the United States and then shipped to Mexico, along with the thread, buttons, and zippers necessary to complete the garments. App. 37–38. There the trousers were sewn and reshipped to the United States. If that had been the full extent of it, there would be no dispute, for if there were

---

\*Briefs of *amici curiae* urging affirmance were filed for Anhydrides & Chemicals, Inc., et al. by *Richard C. King;* and for the Customs and International Trade Bar Association by *Terence P. Stewart, Bernard J. Babb, Munford Paige Hall II, Rufus E. Jarman, Jr., William D. Outman II, Christopher E. Pey, Melvin Schwechter, David Serko, Sidney N. Weiss,* and *Sandra Liss Friedman.*

mere assembly without other steps, all agree the imported garments would have been eligible for the duty exemption which respondent claims.

Respondent, however, in the Government's view, added one other step at the Mexican plant: permapressing. Permapressing is designed to maintain a garment's crease in the desired place and to avoid other creases or wrinkles that detract from its proper appearance. There are various methods and sequences by which permapressing can be accomplished, and one of respondent's contentions is that the Treasury's categorical approach fails to take these differences into account.

For the permapressed garments in question here, respondent purchased fabric in the United States that had been treated with a chemical resin. *Id.*, at 37. After the treated fabric had been cut in the United States, shipped to Mexico, and sewn and given a regular pressing there, respondent baked the garments in an oven at the Mexican facility before tagging and shipping them to the United States. The baking operation took some 12 to 15 minutes. *Id.*, at 38. With the right heat, the preapplied chemical was activated and the permapress quality was imparted to the garment. If it had delayed baking until the articles returned to the United States, respondent would have had to take extra, otherwise unnecessary steps in the United States before shipping the garments to retailers. *Id.*, at 127–128; App. to Pet. for Cert. 20a–21a. In addition, respondent maintained below, there would have been a risk that during shipping unwanted creases and wrinkles might have developed in the otherwise finished garments. *Ibid.*

The Customs Service claimed the baking was an added process in addition to assembly, and denied a duty exemption; respondent claimed the baking was simply part of the assembly process, or, in the words of the controlling statute, an "operatio[n] incidental to the assembly process." Subheading 9802.00.80, Harmonized Tariff Schedule of the

United States (HTSUS), 19 U. S. C. § 1202; Item 807.00, Tariff Schedule of the United States (TSUS), 19 U. S. C. § 1202 (1982 ed.). Respondent's case was made more difficult by a regulation, to be discussed further, that deems all permapressing operations to be an additional step in manufacture, not part of or incidental to the assembly process. See 19 CFR § 10.16(c) (1998). The issue before us is the force and effect of the regulation in subsequent judicial proceedings.

After being denied the exemption it sought for the permapressed articles, respondent brought suit for refund in the Court of International Trade. The court declined to treat the regulation as controlling. 938 F. Supp. 868, 874–875 (1996). In making its determination, the court relied on a detailed analysis stemming from *United States* v. *Mast Industries, Inc.*, 668 F. 2d 501 (CCPA 1981), a leading precedent on this duty exemption from the predecessor to the Court of Appeals for the Federal Circuit. *Mast Industries*, in fact, involved garment fabrication and assembly, though the Court of International Trade drew also on cases involving other assembly operations. *E. g.*, 938 F. Supp., at 872 (citing *General Motors Corp.* v. *United States*, 976 F. 2d 716 (CA Fed. 1992) (painting of sheet metal component parts used in motor vehicles)). The court ruled in favor of respondent. 938 F. Supp., at 875. On review, the Court of Appeals for the Federal Circuit declined to analyze the regulation under *Chevron*, and affirmed. 127 F. 3d 1460, 1462 (1997). We granted certiorari, 524 U. S. 981 (1998), and we now vacate the judgment of the Court of Appeals and remand the case for further proceedings.

## II

The statute on which respondent relies provides importers a partial exemption from duties otherwise imposed. The exemption extends to:

> "Articles . . . assembled abroad in whole or in part of fabricated components, the product of the United States,

which . . . (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting." Subheading 9802.00.80, HTSUS, 19 U. S. C. § 1202.

(The HTSUS became law on January 1, 1989, replacing the provisions of the former TSUS. See 19 U. S. C. § 3004. Item 807.00 of the TSUS, the previous statute which governs some of the shipments at issue in this case, is identical to HTSUS Subheading 9802.00.80.)

The relevant regulation interpreting the statute with respect to permapressed articles provides as follows:

"Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article. The following are examples of operations not considered incidental to the assembly . . . :

"(4) Chemical treatment of components or assembled articles to impart new characteristics, such as showerproofing, permapressing, sanforizing, dying or bleaching of textiles." 19 CFR § 10.16(c) (1998).

The regulation was adopted in 1975 by the Commissioner of Customs upon approval by the Treasury Department, after notice-and-comment rulemaking. See 39 Fed. Reg. 24651 (1974) (proposed regulation); 40 Fed. Reg. 43021 (1975) (final regulation).

In contending that the regulation is not within the general purview of the *Chevron* framework, respondent advances two sets of arguments. First, citing the terms of the regula-

tion and its enabling statutes, respondent contends the regulation is limited in application to customs officers themselves and is not intended to govern the adjudication of importers' refund suits in the Court of International Trade. Second, in reliance on the authority and jurisdiction of the Court of International Trade, respondent argues that even if the Treasury Department did intend the regulation to bear on the determination of refund suits, the Court of International Trade is empowered to interpret the tariff statute without giving the usual deference to regulations issued by the administering agency.

As to the first set of arguments, respondent says the regulation binds Customs Service employees when they classify imported merchandise under the tariff schedules but does not bind the importers themselves. The statutory scheme does not support this limited view of the force and effect of the regulation. The Customs Service (which is within the Treasury Department) is charged with the classification of imported goods under the proper provision of the tariff schedules in the first instance. There is specific statutory direction to this effect: "The Customs Service shall, under rules and regulations prescribed by the Secretary [of the Treasury,] . . . fix the final classification and rate of duty applicable to" imported goods. 19 U. S. C. § 1500(b). In addition, the Secretary is directed by statute to "establish and promulgate such rules and regulations not inconsistent with the law . . . as may be necessary to secure a just, impartial and uniform appraisement of imported merchandise and the classification and assessment of duties thereon at the various ports of entry." § 1502(a). See also General Headnote 11, TSUS, 19 U. S. C. § 1202 (1982 ed.) (authorizing the Secretary "to issue rules and regulations governing the admission of articles under the provisions" of the tariff schedules); General Note 20, HTSUS, 19 U. S. C. § 1202 (same). The Secretary, in turn, has delegated to the Commissioner of Customs the authority to issue generally applicable regulations, sub-

ject to the Secretary's approval. Treasury Dept. Order No. 165, T. D. 53160 (Dec. 15, 1952).

Respondent relies on the specific direction to the Secretary to make rules of classification for "the various ports of entry" to argue that the statute authorizes promulgation of regulations that do nothing more than ensure that customs officers in field offices around the country classify goods according to a similar and consistent scheme. The regulations issued under the statute have no bearing, says respondent, on the rights of the importer. We disagree. The phrase in question is explained by the simple fact that classification decisions must be made at the port where goods enter. We shall not assume Congress was concerned only to ensure that customs officials at the various ports of entry make uniform decisions but that it had no concern for uniformity once the goods entered the country and judicial proceedings commenced. The tariffs do not mean one thing for customs officers and another for importers. It is of course possible, even common, for agencies to give instructions or legal opinions to their officers and employees in one form or another, without intending to bind the public. Cf. *Crandon* v. *United States*, 494 U. S. 152, 177 (1990) (SCALIA, J., concurring in judgment). The statutory authorization for the regulations in this case, we conclude, was not limited in this way. Like other regulations which help to define the legal relations between the Government and regulated entities, customs regulations were authorized by Congress at least in part to clarify the rights and obligations of importers.

Our conclusion is not altered by the circumstance that the United States Trade Representative (USTR), by delegation from the President, and the International Trade Commission (ITC) have certain responsibilities for recommending and proclaiming changes in the HTSUS. See 19 U. S. C. §§ 3004(c), 3005, 3006; 3 CFR 443 (1992). These powers pertain to changing or amending the tariff schedules themselves; the Treasury Department and the Customs Service

are charged with administering the adopted schedules applicable on the date of importation. This also is the position of the Government, for it acknowledged at oral argument that it is for the Treasury Department and the Customs Service, not for the USTR or ITC, to issue regulations entitled to judicial deference in the interpretation of the tariff schedules. Tr. of Oral Arg. 14.

Respondent further cites a portion of the regulation and argues that the Customs Service itself views its regulatory authority as limited to controlling its own agents' classification decisions, without affecting the course of later proceedings. It cites subsection (a) of 19 CFR § 10.11 (1998), which introduces § 10.16 and the other classification regulations adopted at the same time. Section 10.11(a) provides that "[t]he definitions and regulations that follow are promulgated to inform the public of the constructions and interpretations that the United States Customs Service shall give to relevant statutory terms and to assure the impartial and uniform assessment of duties upon merchandise claimed to be partially exempt from duty . . . at the various ports of entry." It further provides that "[n]othing in these regulations purports or is intended to restrict the legal right of importers or others to a judicial review of the matters contained therein." *Ibid.*

This language, in our view, does not suffice to displace the usual rule of *Chevron* deference. Subsections (a) and (b) of § 10.11 together serve to introduce the two kinds of regulations which follow. Section 10.11(b) advises that a refund claimant must comply with both the substantive terms of the statute and with certain "documentary requirements" set forth in § 10.24. If the importer fails to comply with the documentary requirements, it is foreclosed from judicial review of the classification decision. § 10.11(b). In contrast, subsection (a) recites that nothing in the substantive classification regulations "purports or is intended to restrict the legal right . . . to a judicial review of the matters contained

therein." Assuming an importer complies with the documentary requirements of § 10.24, the disclaimer in § 10.11(a) is applicable, and the importer is entitled to bring a refund suit challenging Customs' decision in federal court.

Apart from underscoring this distinction between substantive rules and documentary requirements, the quoted language from § 10.11(a) may be thought surplusage in that it merely confirms the existence of judicial review. Even if the language is thought to be unnecessary, however, we do not view it as a tacit instruction for courts to disregard the substantive regulations. Particularly in light of the fact that the agency utilized the notice-and-comment rulemaking process before issuing the regulations, the argument that they were not intended to be entitled to judicial deference implies a sufficient departure from conventional contemporary administrative practice that we ought not to adopt it absent a different statutory structure and more express language to this effect in the regulations themselves.

### III

For the reasons we have given, the statutes authorizing customs classification regulations are consistent with the usual rule that regulations of an administering agency warrant judicial deference; and nothing in the regulation itself persuades us that the agency intended the regulation to have some lesser force and effect. We turn to respondent's second major contention, that the statutes governing the reviewing authority of the Court of International Trade in classification cases displace this customary framework.

In support of the argument that *Chevron* rules are inapplicable, both respondent and the Court of Appeals rely on 28 U. S. C. § 2643. It provides:

> "If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such

further administrative or adjudicative procedures as the court considers necessary to reach the correct decision."

The authority of the Court of International Trade to order additional proceedings to reach the correct decision, as well as its duty to "make its determinations upon the basis of the record made before the court," § 2640(a), and its authority to consider new grounds not advanced to the agency, § 2638, are said to be inconsistent with deference to an agency's regulation.

A central theme in respondent's argument is that the trial court proceedings may be, as they were in this case, *de novo*, and hence the court owes no deference to the regulation under *Chevron* principles. Brief for Respondent 16–28. The conclusion does not follow from the premise. Valid regulations establish legal norms. Courts can give them proper effect even while applying the law to newfound facts, just as any court conducting a trial in the first instance must conform its rulings to controlling statutes, rules, and judicial precedents. Though Congress might have chosen to direct the court not to pay deference to the agency's views, we do not find that directive in these statutes. Cf. Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L. J. 511, 515–516 (suggesting that "[i]f . . . Congress had specified that in all suits involving interpretation or application of [a statute] the courts were to give no deference to the agency's views, but were to determine the issue de novo," *Chevron* deference would be inappropriate). *De novo* proceedings presume a foundation of law. The question here is whether the regulations are part of that controlling law. Deference can be given to the regulations without impairing the authority of the court to make factual determinations, and to apply those determinations to the law, *de novo*.

The Court of Appeals held in this case, and in previous cases presenting the issue, that these regulations were not entitled to deference because the Court of International Trade is charged to "'reach the correct decision'" in deter-

mining the proper classification of goods. 127 F. 3d, at 1462; see also *Rollerblade, Inc.* v. *United States,* 112 F. 3d 481, 483 (CA Fed. 1997); *Universal Elecs. Inc.* v. *United States,* 112 F. 3d 488, 491–493 (CA Fed. 1997). The whole point of regulations such as these, however, is to ensure that the statute is applied in a consistent and proper manner. Deference to an agency's expertise in construing a statutory command is not inconsistent with reaching a correct decision.

The analysis of a regulation's application in any particular case, of course, may disclose an imprecise or imperfect implementation of the statute. "One can doubtless imagine questionable applications of the regulation that test the limits of the agency's authority." *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.,* 515 U. S. 687, 714 (1995) (O'CONNOR, J., concurring). In the process of considering a regulation in relation to specific factual situations, a court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it. In those instances, the regulation will not control. Under *Chevron,* if a court determines that "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U. S., at 842–843. If, however, the agency's statutory interpretation "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give [that] judgment 'controlling weight.'" *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.,* 513 U. S. 251, 257 (1995) (quoting *Chevron, supra,* at 844).

A statute may be ambiguous, for purposes of *Chevron* analysis, without being inartful or deficient. The present case exemplifies the familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect. Here Congress has authorized the agency to issue rules so that the tariff statutes may be applied to unforeseen situations and

changing circumstances in a manner consistent with Congress' general intent. The statute under which respondent claims an exemption gives direction not only by stating a general policy (to grant the partial exemption where only assembly and incidental operations were abroad) but also by determining some specifics of the policy (finding that painting, for example, is incidental to assembly). For purposes of the *Chevron* analysis, the statute is ambiguous nonetheless, ambiguous in that the agency must use its discretion to determine how best to implement the policy in those cases not covered by the statute's specific terms. Those specifics are instructive to the agency as to the general congressional purpose, and the agency's rules as to instances not covered by the statute should be parallel, to the extent possible, with the specific cases Congress did address.

Finally, respondent and a supporting *amicus* contend *Chevron* deference is inconsistent with the historical practice in customs cases. Brief for Respondent 1–6; Brief for Customs and International Trade Bar Association as *Amicus Curiae* 6–11. This history, suffice it to say, is not so uniform and clear as to convince us that judicial deference would thwart congressional intent. As early as 1809, Chief Justice Marshall noted in a customs case that "[i]f the question had been doubtful, the court would have respected the uniform construction which it is understood has been given by the treasury department of the United States upon similar questions." *United States* v. *Vowell*, 5 Cranch 368, 372. See also P. Reed, The Role of Federal Courts in U. S. Customs & International Trade Law 289 (1997) ("Consistent with the *Chevron* methodology, and as has long been the rule in customs cases, customs regulations are sustained if they represent reasonable interpretations of the statute"); cf. *Zenith Radio Corp.* v. *United States*, 437 U. S. 443, 450 (1978) (deferring to the Treasury Department's "longstanding and consistent administrative interpretation" of the countervailing duty provision of the Tariff Act).

IV

A

The customs regulations may not be disregarded. Application of the *Chevron* framework is the beginning of the legal analysis. Like other courts, the Court of International Trade must, when appropriate, give regulations *Chevron* deference. Cf. *Atlantic Mut. Ins. Co.* v. *Commissioner*, 523 U. S. 382, 389 (1998) (when a term in the Internal Revenue Code is ambiguous, "the task that confronts us is to decide, not whether the Treasury regulation represents the best interpretation of the statute, but whether it represents a reasonable one"). The expertise of the Court of International Trade, somewhat like the expertise of the Tax Court, guides it in making complex determinations in a specialized area of the law; it is well positioned to evaluate customs regulations and their operation in light of the statutory mandate to determine if the preconditions for *Chevron* deference are present.

B

In addition to the applicability of the *Chevron* framework in general, we also granted certiorari on a second question, asking whether 19 CFR § 10.16(c) (1998) met the preconditions for *Chevron* deference as a reasonable interpretation of the statutory phrase "operations incidental to the assembly process," Subheading 9802.00.80, HTSUS, 19 U. S. C. § 1202, and Item 807.00, TSUS, 19 U. S. C. § 1202 (1982 ed.). Because the Court of Appeals determined the *Chevron* framework was not applicable, it did not go on to consider whether the regulation ultimately warrants deference under that framework.

Respondent has made various arguments turning on the details and facts of its manufacturing process, including substantial arguments challenging the regulation's interpretation of the statutory language as well as the application of the regulation to the particular process and goods at issue

here. For instance, the Customs Service granted the exemption for trousers made from a pure synthetic fabric, which were apparently pressed in the Mexico facility. App. 33, 37; Brief for Respondent 47. Yet it denied the exemption when ovenbaking was used for 12 to 15 minutes after some pressing, notwithstanding the fact that the permapress characteristics could have been achieved on the trousers involved here by pressing them for an additional period of time in lieu of ovenbaking. Tr. 79–87. Moreover, though the regulation refers to the "[c]hemical treatment of components, . . . such as . . . permapressing," 19 CFR § 10.16(c)(4) (1998), it is undisputed that the chemical resin was applied to the trousers in the United States. App. 37.

It will be open to respondent on remand to argue that the baking of the garments in quantity is, from the standpoint of the statute or the regulation itself, no less incidental to the assembly process which the statute permits, or no more within the regulation's reference to permapressing, than is a pressing-only operation. We conclude that these and similar arguments, which raise the difficult question of how the regulation at issue fares under the *Chevron* framework, are best addressed in the first instance to the Court of Appeals for the Federal Circuit or to the Court of International Trade. Declining to reach the second question on which certiorari was granted, we remand the case to the Court of Appeals.

The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

Like the statutory provision it explicates, the Customs Service regulation at issue begins with a generally applicable standard for a duty exemption, and concludes with relatively specific examples that indicate how that standard should be interpreted. See Subheading 9802.00.80, Harmo-

nized Tariff Schedule of the United States, 19 U. S. C. § 1202 (listing operations taking place abroad that meet the standard); Item 807.00, Tariff Schedule of the United States, 19 U. S. C. § 1202 (1982 ed.) (same); 19 CFR § 10.16(c) (1998) (listing such operations that do not meet the standard). Surely the agency's effort to enumerate "significant" and common operations not to be considered incidental to the assembly process was both permissible and sensible. Nothing in the statute or its history convinces me otherwise; in my opinion, the regulation is clearly valid.

Respondent's strongest challenge to the judgment of the Customs Service is that the Service has misinterpreted and misapplied one of its excluded examples: "Chemical treatment . . . to impart new characteristics, such as . . . permapressing." 19 CFR § 10.16(c)(4) (1998). With respect to the entries denied a duty exemption in this case, the fabric was resin treated in the United States at the textile mill, but pressed and ovenbaked in Mexico after assembly. Yet the Service apparently granted a duty exemption for trousers respondent assembled from synthetic fabric; these trousers did not require ovenbaking or resin treatment, but they were pressed in Mexico after assembly. See App. to Pet. for Cert. 8a–9a, 15a–16a; App. 33–34, 37–38. Respondent contends that the Service cannot treat pressing-plus-ovenbaking, but not pressing alone, as a species of chemical treatment that is not incidental to the assembly process.

There is a rather obvious answer to this contention. One can certainly discern a meaningful difference between merely pressing a synthetic fabric, on the one hand, and using ovenbaking (or perhaps extended pressing) to treat a fabric to which another substance has been added. Based on that difference, the Service could logically conclude, in accord with its understanding of its own regulation, that only the latter is a form of "chemical treatment" excluded from a duty exemption. Indeed, distinguishing these two operations in this fashion is the product of the kind of line-drawing

decisions that must be made by agencies to which Congress has delegated the job of administering legislation that contains ambiguous terms.  When lines must be drawn to determine whether a particular facility is a "stationary source" of air pollution, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), or whether an operation performed abroad was "incidental to the assembly process," there will always be cases on opposite sides of the line that are almost identical.  That consequence, however, does not necessarily compromise the integrity of the line that the agency has drawn or the manner in which the rule was applied.

In my view, the regulation before us is a reasonable elaboration of the statute, and the Customs Service's denial of a duty allowance in this case was consistent with its regulation and well within the scope of its congressionally delegated authority.  If we had not granted certiorari to decide the reasonableness of the regulation, I would agree with the Court's disposition of the case.  See *Kumho Tire Co.* v. *Carmichael*, 526 U. S. 137, 159 (1999) (STEVENS, J., concurring in part and dissenting in part).  But since we did direct the parties to enlighten us on these issues, and since I think the answer is clear, I would simply reverse the judgment of the Court of Appeals.  I do, however, join Parts I, II, and III of the Court's well-reasoned opinion.