**Slip Op. 00-124**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

```
_____
                                  :
DAIMLERCHRYSLER CORPORATION,      :
                                  :
            Plaintiff,            :
                                  :
        v.                        :   Court No. 99-03-00178
                                  :
UNITED STATES,                    :
                                  :
            Defendant.            :
_____ :
```

[Cross-Motions for Summary Judgment Denied.]

Dated:  September 29, 2000

Barnes, Richardson & Colburn (Robert E. Burke, Lawrence M. Friedman and Robert F. Seely), for plaintiff.

David W. Ogden, Assistant Attorney General, Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice (Saul Davis), Paula Smith, Office of Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

**OPINION**

**RESTANI, Judge:** This Customs duty matter is before the court on cross-motions for summary judgment.  No discovery has taken place and both parties seek judgment based on the factual record and the court's findings in Chrysler Corp. v. United States, 19 CIT 353 (1995), aff'd, 86 F.3d 1173, 1996 WL 132263 (Fed. Cir. 1996) (unpublished opinion) ("Chrysler").  Each party also alleges that if judgment is not granted on its theory of the law

applicable to the facts, material facts remain to be decided and judgment may not be granted to its opponent.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1994).  The court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  USCIT Rule 56(a).

## BACKGROUND

The 1991 to 1994 entries of automobiles at issue include domestic sheet metal parts which are exported and assembled into the finished automobiles in Mexico, and in the course of that assembly undergo a complicated painting process.  Plaintiff seeks exemption from duty for the sheet metal parts under item 9802.00.80 of the Harmonized Tariff Schedule of the United States (codified at 19 U.S.C. § 1202 (1994)) ("HTSUS").  Item HTSUS 9802.00.80 reads as follows:

> Articles ... assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting.

HTSUS 9802.00.80, Supp. I. (1999).

In Chrysler, the court opined that it was bound by the holding of General Motors Corp. v. United States, which dealt with the same type of product and a similar paint process. Chrysler, 19 CIT at 354 (citing General Motors Corp. v. United States, 976 F.2d 716 (Fed. Cir. 1992) ("GM")).  In GM, the court followed a line of cases beginning with United States v. Mast Indus., Inc., which limit operations "incidental to the assembly process" to minor operations.  GM, 976 F.2d at 719 (citing United States v. Mast Indus., Inc., 668 F.2d 501, 505 (Fed. Cir. 1981)). In GM, the court held that the following legislative history supported that view:

> The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting."  It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance.  For example, in fitting the parts of a machine together, it may be necessary . . . to paint or apply other preservative coatings. . .. Such operations, if of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

GM, 976 F.2d at 719 (citing H.R. Rep. No. 342, 1965 U.S.C.C.A.N. 3,416, 3,448-449).  GM and Chrysler also followed Mast in applying a set of quantitative comparisons to determine whether the process claimed to be incidental to assembly was "minor."

See GM, 976 F.2d at 719 (listing three factors to ascertain whether operation is minor); Mast, 668 F.2d 506 (same); Chrysler, 19 CIT at 355 (listing two of the factors dispositive in that case).

The parties are now before the court because Mast has been undermined by the Supreme Court's decision in United States v. Haggar Apparel Co., 526 U.S. 380 (1999) ("Haggar"). The parties agree that Haggar, which involved the same statute but a different product - permapressed pants, has eliminated the Mast comparison tests. What they do not agree on is whether Haggar also removed the minor operation limitation of Mast. Plaintiff contends that in the course of removing the Mast quantitative tests, and deferring to Customs' regulatory qualitative approach, the Supreme Court in Haggar held that "painting" was unambiguously established in the statute as a qualitative category of operation that preserves the exemption from duty of the affected part. Plaintiff relies on the following language of Haggar:

> The statute under which respondent claims an exemption gives direction not only by stating a general policy (to grant the partial exemption where only assembly and incidental operations were abroad) but also by determining some specifics of the policy (finding that painting, for example, is incidental to assembly). For purposes of the Chevron analysis, the statute is ambiguous nonetheless, ambiguous in that the agency must use its discretion to determine how best to

implement the policy in those cases not covered by the statute's specific terms.

Haggar, 526 U.S. at 393 (emphasis added).

Thus, plaintiff argues, in deciding that the statute was ambiguous as to permapressing and other processes not mentioned in the statute, so that Customs could establish regulatory exempt and nonexempt categories of unmentioned operations, the Supreme Court declared the three categories of operations mentioned in the statute, "cleaning, lubricating and painting," unambiguously "incidental to assembly" and not subject to Customs regulations.[1]

Defendant, on the other hand, argues that the word "painting" cannot be read in isolation, that the statute as a whole is ambiguous, and that the regulations reasonably clarify the statute. The regulation at issue reads, in relevant part, as follows:

### § 10.16 Assembly abroad.

*(a) Assembly operations.* The assembly operations performed abroad may consist of any method used to join or fit together solid components, such as welding,

---

[1] Prior to the Supreme Court's decision in Haggar, Customs' regulations were all but irrelevant to interpretation of HTSUS 9802.00.80. See Haggar Apparel Co. v. United States, No. 97-1002, 2000 WL 1035747, at *2 (Fed. Cir. July 27, 2000) ("Haggar II"). The court did not defer to regulations, but rather applied the Mast test. Id. In Haggar, the Supreme Court required the court to apply the analysis of Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984), to regulations interpreting tariff provisions. Haggar, 526 U.S. at 393-94.

soldering, riveting, force fitting, gluing, laminating, sewing, or the use of fasteners, and may be preceded, accompanied, or followed by operations incidental to the assembly as illustrated in paragraph (b) of this section.  The mixing or combining of liquids, gases, chemicals, food ingredients, and amorphous solids with each other or with solid components is not regarded as an assembly.

*(b) Operations incidental to the assembly process.* Operations incidental to the assembly process whether performed before, during, or after assembly, do not constitute further fabrication, and shall not preclude the application of the exemption.  The following are examples of operations which are incidental to the assembly process:

(1) Cleaning;

(2) Removal of rust, grease, paint, or other preservative coating;

(3) Application of preservative paint or coating, including preservative metallic coating, lubricants, or protective encapsulation;

(4) Trimming, filing, or cutting off of small amounts of excess materials;

(5) Adjustments in the shape or form of a component to the extent required by the assembly being performed abroad;

(6) Cutting to length of wire, thread, tape, foil, and similar products exported in continuous length; separation by cutting of finished components, such as prestamped integrated circuit lead frames exported in multiple unit strips; and

(7) Final calibration, testing, marking, sorting, pressing, and folding of assembled articles.

*(c) Operations not incidental to the assembly process.* Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article.  The following are examples of operations not considered incidental to the assembly as provided under

subheading 9802.00.80, Harmonized Tariff Schedule of the United States (19 U.S.C. 1202):
    (1) Melting of exported ingots and pouring of the metal into molds to produce cast metal parts;
    (2) Cutting of garment parts according to pattern from exported material;
    (3) Painting primarily intended to enhance the appearance of an article or to impart distinctive features or characteristics;
    (4) Chemical treatment of components or assembled articles to impart new characteristics, such as showerproofing, permapressing, sanforizing, dying or bleaching of textiles;
    (5) Machining, polishing, burnishing, peening, plating (other than plating incidental to the assembly), embossing, pressing, stamping, extruding, drawing, annealing, tempering, case hardening, and any other operation, treatment or process which imparts significant new characteristics or qualities to the article affected.

19 C.F.R. § 10.16 (1999).

Plaintiff argues alternatively that its processes abroad satisfy the regulation because the sheet metal parts are assembled and treated only with "preservative paint or coating," which is "incidental to assembly" pursuant to 19 C.F.R. § 10.16(b)(3).  Defendant argues that plaintiff's operations are a significant process that completes or improves the sheet metal components and imparts distinctive or significant new features, characteristics or qualities to the article affected.  Thus, it argues that the painting process is not "incidental to assembly" as provided in 19 C.F.R. § 10.16(c)(3) & (5).

DISCUSSION

    I.    The term "painting" in HTSUS 9801.80.00 does
         not prohibit application of 19 C.F.R. § 10.16
         to this case.

As Chrysler made clear, the court concluded therein that it was bound by GM's holding that any attendant paint processes must be minor to qualify a part assembled abroad for duty exemption under item 9802.80.00, and that the Mast factors applied in GM required the conclusion that the painting process at issue was not "incidental to the assembly process." Chrysler, 19 CIT at 355. While both parties agree that the Mast quantitative factor aspect of GM no longer applies, defendant argues that GM's interpretation of "incidental to the assembly process" as limited to "minor" processes still controls.

The court finds it difficult to declare all of GM effectively overruled based on the words of Haggar. The words of Haggar cited by plaintiff can be read in various ways. They may mean that "painting" is an unambiguous term. They also may mean that as to "painting" the statute is less ambiguous. See Haggar, 526 U.S. at 393. No facts similar to the facts in this case were before the Supreme Court in Haggar, while very similar painting processes were before the appellate court in GM. Compare Haggar, 526 U.S. at 384-85 (addressing whether baking permapressed garments was incidental to assembly process); and GM, 976 F.2d at

717-18 (addressing whether topcoats applied to automobiles were incidental to assembly process). Haggar had nothing to do with painting processes. Furthermore, in Haggar II, the Court of Appeals did not reject all of its previous jurisprudence on the meaning of "incidental to the assembly process." Rather, it noted the "exemplars" in the statute and observed:

> Customs has decided that some kinds of painting are "incidental," and others are not, the distinction in the regulation being whether the paint operation is primarily for preservative or for decorative purposes. Compare, e.g., 19 C.F.R. § 10.16(b)(3) (listing "[a]pplication of preservative paint or coating, including preservative metallic coating . . ." as incidental to the assembly process) with 19 C.F.R. § 10.16(c)(3) (listing "[p]ainting primarily intended to enhance the appearance of an article or impart distinctive features or characteristics" as not incidental to the assembly process).

Haggar II, No. 97-1002, 2000 WL 1035747, at *4.

While this implicit approval of the regulation as to painting might be dicta, the court has a difficult time rejecting a statement that is in the very opinion that was required to apply the Supreme Court's statements in Haggar. Further, although Customs' "categorical approach" was approved in both Haggar cases, Customs is not forbidden by either Haggar case from prescribing additional general qualitative tests, as it does in the regulation.

The court has already noted that a general qualitative limitation of "incidental to the assembly process" is found in

the relevant legislative history.  The regulation reasonably adopts this approach.  It is true that general qualitative terms such as "minor," or "significant," a regulatory term, are difficult to assess.  Presumably this is why Customs has tried to define them by identifying categories of incidental or not incidental operations, where possible.  Nevertheless, Customs cannot foresee every circumstance, and it is forced also to employ general qualitative terms, as it does in 19 C.F.R. § 10.16(c)(3) & (5).  This is consistent with the GM view of the essential meaning of "incidental to the assembly process."  GM, 976 F.2d at 720.  Thus, if GM still has any force, the regulations carry out what remains of it.

The next question is, assuming arguendo that "painting" has an unambiguous meaning in the statute, does that unambiguous meaning of painting embrace what is at issue here so as to prevent the application of the regulation?  To answer this question the court notes how it described in Chrysler the Mexican operations on the sheet metal components imported from the United States.

> In the initial stages of assembly, sheet metal components are welded together in the body shop.  A metal finishing operation takes place to locate and detect any defects and to prepare the body for painting.  The parties disagree as to whether metal finishing is part of the painting process.  Although it appears more closely related to the painting process, resolution of this matter is not dispositive.  The

> disputed processes all occur in connection with the
> paint operation.  This begins with cleaning, a
> phosphate application to prepare the metal body for
> primer, some sealing, anti-chip coating application,
> baking, application of one or two color coats and a
> clear coat, followed by more baking.

Chrysler, 19 CIT at 354 (footnote omitted).  Because there was no

description in Haggar of "painting," one cannot be sure whether

the Supreme Court would find that the term "painting" in the

statute means either all of the operations that are arguably part

of the painting process in this case, or those which might come

within a broad definition of the term "painting."

Accordingly, the court concludes, as apparently the

appellate court did in Haggar II, that there is room for the

operation of the Customs' regulation as to painting operations or

processes.  That regulation is now the focus of the court's

inquiry, as it was not in Chrysler.

> II.  The court's decision in Chrysler does not resolve the
>      issue of the application of 19 C.F.R. § 10.16 to this
>      case.

19 C.F.R. § 10.16(b) recognizes "application of preservative

paint or coating, including preservative metallic coating,

lubricants, or protective encapsulation" as an operation

"incidental to the assembly process."  Section 10.16(c), however,

prohibits any "significant process, operation, or treatment . . .

whose primary purpose is the . . . completion [or] physical or

chemical improvement of a component" from qualifying as "incidental to the assembly process."  19 C.F.R. § 10.16(c).  It goes on to include "[p]ainting primarily intended to enhance the appearance of an article or to impart distinctive features or characteristics" as non-qualifying.  19 C.F.R. § 10.16(c)(3).  It also regards as non-qualifying any operation which "imparts significant new characteristics or qualities to the article affected."  19 C.F.R. § 10.16(c)(5).

The court in Chrysler was not required to apply the regulation because the GM case had resolved the issue without regard to the regulation.  The court did opine that, of the paint process as a whole, 70% was primarily for preservative purposes, and as to the top coats it was "impossible to separate their appearance-enhancing features from their preservative functions." Chrysler, 19 CIT at 355.  The parties now seem to agree that all of the steps prior to top-coating are preservative and would not render the sheet metal parts dutiable.  The dispute is now expressly limited to the status of the top-coating processes.

The court in Chrysler did not restrict its analysis to top-coating.  Nor, as indicated, is the legal context the same as it was in Chrysler.  If the facts of this case turn out to be as they were in Chrysler, the court would have to address the legal issue of whether a process that is neither primarily preservative

nor primarily appearance enhancing falls into § 10.16(b),

"incidental," or § 10.16(c) "not incidental," or whether the top

coats by themselves impart "significant new characteristics . . .

to the article affected.  19 U.S.C. § 10.16(c)(5).

The court declines to decide these issues in a vacuum.  The

facts of this case may not be exactly as they were in Chrysler.

Either party may choose to put on different evidence which might

resolve the issue more clearly.  See United States v. Stone &

Downer Co., 274 U.S. 225, 236-7 (1927) (judgment as to

classification of one entry is not res judicata as to another).

While stare decisis applies, there are exceptions to its

application.  See Schott Optical Glass v. United States, 750 F.2d

62, 64 (Fed. Cir. 1984) (evidence may demonstrate decision was

clearly erroneous).  See also J.E. Bernard & Co., 66 Cust. Ct.,

545, 552, 324 F. Supp. 496, 502-3 (1971) (in reappraisement case,

estoppel applied where matters in prior case were static,

factually and legally).  Because of the change in the legal

climate, the parties will be allowed to offer new evidence,

although such evidence may be limited as befits the previous

history of this matter.  Accordingly, summary judgment is denied. The parties shall submit a proposed Rule 16 order within eleven days.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

        This 29th day of September, 2000.