**BAYOU LAWN & LANDSCAPE SERVICES, et al.,**
**Plaintiffs,**

**v.**

**Jeh C. JOHNSON, et al., Defendants.**

**Case No.3:15cv249/MCR/EMT**

United States District Court,
N.D. Florida,
**Pensacola Division.**

Signed March 25, 2016

Wendel Vincent Hall, Hall Law Firm PLLC, Washington, DC, Robert Conrad Palmer, III, Wade Palmer & Shoemaker PA, Pensacola, FL, for Plaintiffs.

Erez Reuveni, Glenn Matthew Girdharry, Sarah Stevens Wilson, US Department of Justice, Washington, DC, for Defendants.

## ORDER

### M. CASEY RODGERS, CHIEF UNITED STATES DISTRICT JUDGE

This case involves a challenge to the validity of two regulations promulgated jointly by the Department of Homeland Security and the Department of Labor in 2015 in connection with the H–2B visa

program, which allows employers to import temporary, foreign workers for non-agricultural jobs in certain circumstances. *See Temporary Non–Agricultural Employment of H–2B Aliens in the United States*, 80 Fed.Reg. 24042 (Apr. 29, 2015) ("2015 Program Rule"); *Wage Methodology for the Temporary Non–Agricultural Employment H–2B Program*, 80 Fed.Reg. 24146 (Apr. 29, 2015) ("2015 Wage Rule"). The Plaintiffs are Bayou Lawn and Landscaping Services, Superior Forestry Services, National Hispanic Landscape Alliance, National Association of Landscape Professionals, and Small and Seasonal Business Legal Center, and the Defendants are Jeh Johnson, Secretary of the Department of Homeland Security, Leon Rodriguez, Director of the United States Citizenship and Immigration Service, Thomas E. Perez, Secretary of the Department of Labor, and Portia Wu, Assistant Secretary of the Employment and Training Administration. The parties have filed cross Motions for Summary Judgment. ECF No. 21, 24. Having carefully considered the matter, the Court finds that Defendants' Motion is due to be granted, and Plaintiffs' Motion is due to be denied.[1]

### Background

The Immigration and Nationality Act of 1952 established a comprehensive statutory framework for the regulation of immigration in this country. *See* Immigration and Nationality Act of 1952 ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101, et seq. In relevant part, the INA included provisions for permanent and temporary foreign workers and provided a means through which those workers could enter the United States for employment purposes as long as certain conditions were met. Prior to 1986, a single program existed for all temporary foreign workers. Congress decided, however, that the earlier program did not "fully meet the need for an efficient, workable and coherent program that protect[ed] the interests of agricultural employers and workers alike" and therefore amended the INA as part of the Immigration Reform and Control Act of 1986 to provide for two separate programs: the H–2A program for agricultural workers and the H–2B program for non-agricultural workers. H.R.Rep. No. 99–682, pt. 1, at 80; *see also* Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99–603, § 301(a), 100 Stat. 3359, 3411 (codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b)).

Under the H–2B program, which is the program relevant to this case, an employer may hire an individual "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such

---

1. Also before the Court are Defendants' Motion to Strike, or in the Alternative, For Leave to File a Response to Plaintiffs' Notice of Supplemental Authority, ECF No. 32, and Plaintiffs' Status Report and Request to Expedite, ECF No. 34. Plaintiffs' Motion to Expedite requests that the Court expedite its ruling on the parties' summary judgment motions. As the Court is due to grant Defendants' Motion for Summary Judgment, and deny Plaintiffs' Motion for Summary Judgment, Plaintiffs' Motion to Expedite is denied as moot. Defendants' Motion seeks to strike or respond to Plaintiffs' Notice of Supplemental Authority, ECF No. 31, which directs the Court's attention to the recent Tenth Circuit case of *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 Fed.Appx. 205 (10th Cir.2015), as amended (Nov. 5, 2015). Defendants contend that Plaintiffs Motion is actually an attempt to raise additional arguments on summary judgment without leave of the Court. The Court denies Defendants' Motion. However, the Court is mindful of Defendants' concern, and has considered *G.H. Daniels* only insofar as it is relevant to the arguments Plaintiffs raised in their Motion for Summary Judgment and Response in Opposition to Defendants Motion for Summary Judgment.

service or labor cannot be found in this country ...." *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). Initially, Congress vested authority for implementation of the INA's provisions in the Attorney General. 8 U.S.C. § (c)(1). However, Congress later transferred enforcement of the immigration laws to the Secretary of the Department of Homeland Security ("DHS") under the Homeland Security Act of 2002. Homeland Security Act of 2002, Pub. L. No. 107–296, § 402, 116 Stat. 2135, 2178 (2002). Although DHS is charged with deciding whether to grant or deny applications for H–2B visas, Congress directed it to consult with other appropriate governmental agencies when considering applications for admission of H–2B workers. *See* 8 U.S.C. §§ 1184(a)(1). Consistent with this directive, DHS requires an employer petitioning for an H–2B visa to first apply for and receive a temporary labor certification from the Secretary of Labor. 8 C.F.R. §§ 214.2(h)(6)(iii)(A), (C). The certification constitutes "advice ... on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers." 8 C.F.R. § 214.2(h)(6)(iii)(A).

The Department of Labor ("DOL") first issued formal regulations establishing standards and procedures for certifying employers' requests to import H–2 workers in 1968. *See* 33 Fed.Reg. 7570 (May 22, 1968). DOL later supplemented the regulations with informal, non-binding guidance letters. It was not until 2008 that DOL published another formal regulation governing the labor certification process. *See Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture (H–2B Workers)*, 73 Fed.Reg. 78020 (Dec. 19, 2008). The 2008 regulations provided rules governing, inter alia, the wages that employers were required to pay H–2B workers. 73 Fed.Reg. at 78056–57. These regulations spawned a long-running controversy over administration of the H–2B program that continues to the present day.

Since 2008, opponents of various aspects of the H–2B program have filed a series of successful court challenges, *see Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, No. 2:09–240 LP, 2010 WL 3431761 (E.D.Pa. Aug. 30, 2010); *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, 933 F.Supp.2d 700 (E.D.Pa.2013); *Bayou Lawn & Landscape Servs. v. Sec'y of Labor (Bayou I)*, 713 F.3d 1080 (11th Cir. 2013); *Comité de Apoyo a los Trabajadores Agrícolas v. Perez*, 774 F.3d 173, 191 (3d Cir.2014); *Bayou Lawn & Landscape Servs. v. Perez (Bayou II)*, 81 F.Supp.3d 1291 (N.D.Fla.2014); *Perez v. Perez (Bayou III)*, Case No. 3:14–cv–00682–MCR–EMT (N.D.Fla. Mar. 4, 2015), and DHS and DOL have continually revised the H–2B regulations in response to these legal setbacks, *see Wage Methodology for the Temporary Non-agricultural Employment H–2B Program*, 76 Fed.Reg. 3452 (Jan. 19, 2011); *Temporary Non–Agricultural Employment of H–2B Aliens in the United States*, 77 Fed.Reg. 10038 (Feb. 21, 2012); *Wage Methodology for the Temporary Non–Agricultural Employment H–2B Program, Part 2*, 78 Fed.Reg. 24047 (Apr. 24, 2013). The instant case involves a challenge to the latest of these regulations, which were promulgated jointly by the DHS and DOL in 2015. *See* 2015 Program Rule, 80 Fed.Reg. 24042; 2015 Wage Rule, 80 Fed.Reg. 24146.[2]

---

**2.** Consistent with its ruling in *Bayou I*, as upheld by the Eleventh Circuit Court of Appeals, 713 F.3d 1080, this Court found in *Bayou II*, 81 F.Supp.3d 1291, and *Bayou III*, No. 3:14–cv–00682–MCR–EMT, that DOL did not have unilateral authority to promulgate

On June 1, 2015, Plaintiffs filed their Complaint in this case along with a Motion for a Temporary Restraining Order and Preliminary Injunctive Relief. The Court denied Plaintiffs' request for a temporary restraining order, and Plaintiffs subsequently withdrew their request for preliminary injunctive relief in exchange for Defendants' assent to expedited discovery. The parties then filed competing motions for summary judgment, which are now before the Court.

### Discussion

In their motion for summary judgment, Plaintiffs argue: (1) DHS violated the APA, 5 U.S.C. § 553, by promulgating the 2015 Program Rule without prior notice and comment; (2) DHS and DOL violated the APA by promulgating the 2015 Wage Rule without prior notice and comment; (3) the 2015 Program Rule and Wage Rule's provision for administering the H-2B program in a way that does not "adversely affect" United States workers impermissibly alters Congress's statutory scheme for that program under the IRCA, 8 U.S.C. § 1101(a)(15)(H)(ii)(b), and is an arbitrary and capricious "per se" rule; and (4) the 2015 Wage Rule is arbitrary and capricious under the APA, 5 U.S.C. § 706,

because its formula for determining whether a particular H-2B wage level would adversely affect United States workers is not rational.[3] Defendants respond that they lawfully skipped notice and comment in regard to the 2015 Program Rule under the APA's "good cause" exception, and did in fact provide notice and comment in connection with the 2015 Wage Rule. They argue that DHS and DOL may consider whether admitting H-2B workers will "adversely affect" United States workers under their broad authority to determine the appropriate criteria for importation of foreign labor under the INA and IRCA. Finally, Defendants attack Plaintiffs' standing to bring this suit based on the lack of a cognizable injury.

█ As a preliminary matter, the Court observes that Plaintiffs have explicitly "move[d] for entry of summary judgment on each count of their Complaint." Plaintiffs' Complaint contains four counts, alleging: (1) DHS and DOL violated the Administrative Procedures Act ("APA"), 5 U.S.C. § 553, in promulgating the 2015 Program Rule and Wage Rule without prior notice and comment; (2) the 2015 Program Rule and Wage Rule are unlawful under the APA, 5 U.S.C. § 706, because they are arbitrary and capricious;[4] (3)

---

H-2B regulations. The 2015 Program Rule and Wage Rule were promulgated jointly by DHS and DOL in response. *See* 80 Fed.Reg. at 24046-47; 80 Fed.Reg. 24147-48. The Eleventh Circuit subsequently vacated *Bayou II* and remanded for consideration of whether the case was moot in light of the new regulations. *Bayou Lawn & Landscape Servs. v. Sec'y, U.S. Dep't of Labor*, 621 Fed.Appx. 620, 621 (11th Cir.2015). The parties have filed briefs on the issue and the Court expects to rule in the near future.

**3.** Plaintiffs also argue that they are entitled to injunctive relief, because the 2015 Program Rule and Wage Rule will cause them irreparable injury. As the Court explains infra, however, Plaintiffs fail to show that these rules are invalid, and therefore, Plaintiffs are not entitled to any relief.

**4.** According to Plaintiffs'.Complaint, the regulations are arbitrary and capricious for the following reasons:
 a. DOL lacked legislative rulemaking authority with respect to the H-2B program;
 b. DHS lacked legislative rulemaking authority to require DOL to certify that a particular H-2B job would not have adverse effect;
 c. DHS lacked legislative rulemaking authority to give DOL a veto over its adjudication of H-2B petitions;
 d. DHS lacked legislative rulemaking authority to promulgate rules for the Fair Labor Standard Act;
 e. DHS' and DOL's definition of temporary is inconsistent with the definition of that term under the Immigration and Nationality Act;

DHS and DOL violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601, et. seq., by failing to conduct a new regulatory flexibility analysis in connection with the 2015 Program Rule and Wage Rule; and (4) a writ of mandamus is appropriate to compel DHS and DOL to continue processing H–2B visa requests in the event that the 2015 Program Rule and Wage Rule are invalidated. Plaintiffs, however, have completely failed to argue any grounds for summary judgment on two of these counts in their Motion for Summary Judgment[5] or Response in Opposition to Defendants' Motion for Summary Judgment. Specifically, Plaintiffs do not mention the DHS and DOL's alleged failure to conduct a regulatory flexibility analysis (Count III), or the propriety of issuing a writ of mandamus (Count IV) in support of or in opposition to summary judgment. "The onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon [o]n summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995); *Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) ("[The district court] could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."); *Boone v. City of McDonough*, 571 Fed.Appx. 746, 751 (11th Cir.2014) (same); *but cf. Mosley v. Alabama Unified Judicial Sys., Admin.*

f. DOL failed to provide data or other evidence to support its programmatic changes;

g. DOL did not provide any evidence that any of the new provisions would avoid injuring U.S. employees;

h. DOL and DHS improperly increased the prevailing wage ostensibly to attract additional U.S. employees, without statutory authority;

i. DOL and DHS erected an irrebuttable presumption of adverse effect if an employer offers less than DHS' and DOL's

*Office of Courts*, 562 Fed.Appx. 862, 865 (11th Cir.2014) (holding plaintiff did not abandon claims in complaint not raised in summary judgment motion, where plaintiff did not move for summary judgment on all claims). Accordingly, the Court finds that Plaintiffs have abandoned these two claims.

■ Furthermore, Plaintiffs fail to meaningfully develop their fourth argument on summary judgment, which pertains to Count II of their Complaint. Plaintiffs' argument on this claim, quoted in its entirety from their Motion for Summary Judgment, is as follows:

The premise of DHS' costly regulation is the asserted need to prevent "adverse effect." Yet, DHS provides no basis for concluding that adverse effect even exists. DHS offers at least two rationales for its assertion that adverse effect might exist. Neither is rational. *See* Bronars Report, ¶¶ 20, 21. This is the heart of DHS' wage rule. DHS' understanding of "adverse effect" is a mathematical artifact of the definition of an "average" or "mean." *See* Bronars Report, ¶ 22. By definition, all other things being equal, a data point below the average will lower the average. But that does mean it will affect wages. But that is not all. DHS failed to consider several other factors that any reasoned decision making process would take into account: *See* Bronars Report, ¶ 38. The

prospective standards and therefore deprive employers of due process and a reasoned decision on their individual certifications; and

j. Such other arbitrary and capricious acts as the record reveals.

5. When the Court refers to Plaintiff's Motion for Summary Judgment, it refers to both the Motion for Summary Judgment, ECF No. 21, and Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 22.

point of this analysis is not so much that DHS is wrong; rather, the point is DHS' haste led it to skip over several major issues with the validity of its central justification for the 2015 H–2B Final Wage Rule in particular but also with the 2015 H–2B Program Rule. The APA guarantees that federal agencies will conduct a logical and rational process in formulating rules and that no rule will have the force of law if it is not the product of a logical and rational process. Neither of the New Rules are the product of such a process and so must be set aside until DHS approaches these issues with the analytical rigor that they deserve and which the APA requires.

Notably, Plaintiffs fail to articulate why the 2015 Wage Rule is not sound. Plaintiffs assert that DHS has two rationales for the Rule, but they identify neither. Plaintiffs criticize DHS's understanding of "adverse effect," but provide no explanation beyond a cryptic comment on the proper way to calculate a mean. And Plaintiffs assert that DHS failed to consider "several other factors" and "skip[ped] over several major issues," but neglect to explain what those factors and issues are and why consideration of those matters was required for an "analytical[ly] rigor[ous]" analysis. Although Plaintiffs do cite to the record in support of their general assertions, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials [in the record] ... on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995); *see also Blue Cross & Blue Shield of Alabama v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990) (rejecting notion that district court must comb through "declarations or affidavits related to summary judgment ... [for information] which might form the basis of an argument ... [when] the party fails to articulate such an argument"). The Court declines Plaintiffs' invitation to comb through the record to find support for their critique of the economic rationale behind DHS and DOL's H–2B wage-level determinations. Therefore, the Court also finds that Plaintiffs have abandoned this argument.

Additionally, Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment raises, but fails to develop, a number of other points. First, Plaintiffs contend that the H–2B regulations are arbitrary and capricious, because of DHS and DOL's "attempt to change Fair Labor Standards Act regulations by adopting a special rule for forestry related operations," but they neglect to explain which "special" portion of the 2015 Program Rule or Wage Rule they refer to, which portion of the Fair Labor Standards Act it would change, or even what that change might be. Second, Plaintiffs contend that DHS and DOL are not "empowered to set a prevailing wage designed to attract U.S. workers into H–2B jobs," but again they fail to direct the Court's attention to any specific portion of the 2015 Program Rule or Wage Rule showing that DHS and DOL are doing this. Instead, Plaintiffs cite to a 2011 Notice of Proposed Rule–Making and public comments received in response to a 2013 Interim Rule—neither of which are at issue in this case. Because Plaintiffs have failed to develop these arguments, the Court finds they have been abandoned as well.

Finally, Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment attempts to raise a new issue not presented in the Complaint. In their Complaint, Plaintiffs include a single line asserting that DHS and DOL's 2015 Program Rule and Wage Rule are arbitrary and capricious, because their "definition of temporary is inconsistent with the definition of that term under the Immigra-

tion and Nationality Act." Defendants addressed this claim in their Motion for Summary Judgment by pointing out that Congress did not actually define "temporary" for purposes of the H–2B program in the INA. However, in Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs abandon their contention that the 2015 Program Rule and Wage Rule are inconsistent with the statute, and instead assert for the first time that the Rules are inconsistent with another of DHS's own regulations, 8 C.F.R. § 214.2(h)(6)(ii)(B). The Court finds that Plaintiffs cannot claim in their Complaint that the Rules contradict Congress's statutory scheme, and then amend that argument in a responsive brief on summary judgment to claim that DHS and DOL's H–2B regulations are internally inconsistent. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir.2006) (explaining that plaintiff may not amend its complaint through argument in a brief in opposition to summary judgment); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004). Therefore, the Court declines to consider this point as well.

The Court now moves to Defendants' argument that Plaintiffs do not have standing to bring this suit, because they have not suffered a cognizable injury. Specifically, Defendants maintain that Plaintiffs'

allegations of injury are hypothetical and depend on the actions of third parties not before the Court. Defendants also contend that Plaintiffs National Hispanic Landscape Alliance, National Association of Landscape Professionals, and Small and Seasonal Business Legal Center cannot establish associational standing, because they do not allege that any specific member of their organizations has suffered a cognizable injury.

▮▮▮▮ To establish standing under Article III, a plaintiff must show: (1) an injury in fact to a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) a causal connection between the injury and the complained-of conduct that is fairly traceable to the defendant's actions, rather than the independent actions of a third party not before the court, and (3) likely, rather than merely speculative, that the injury is redressable by the court.[6] *See Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir.2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The burden to establish standing is on the plaintiff. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Fla. Family Policy Council*, 561 F.3d at 1253. As long as one plaintiff in a case has standing, other plaintiffs may

6. If a plaintiff alleges a procedural injury—such as being denied the opportunity to comment on a proposed regulation—"plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir.2006) (citing *Sierra Club v. Johnson*, 436 F.3d 1269, 1278 (11th Cir. 2006)). With that said, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for

redressability and immediacy." *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (explaining one living adjacent to a proposed dam site "has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though [s]he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years"); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); *United States v. Johnson*, 632 F.3d 912, 921 (5th Cir.2011).

remain in the suit without a standing injury.[7] *See Horne v. Flores,* 557 U.S. 433, 446, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009); *Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 330, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999); *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 264, and n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing .... Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Ouachita Watch League v. Jacobs,* 463 F.3d 1163, 1170 (11th Cir.2006).

 In support of standing, Plaintiffs in this case have submitted the declaration of Michael H. Foley, the president and owner of Superior Forestry Services. Foley states that Superior has relied on the H–2B program for over twenty years, presently employing 259 H–2B workers, and will continue to rely on the program to meet its seasonal labor demands in the future, because it is consistently unable to hire a sufficient number of United States workers for its jobs. Foley maintains that the 2015 Program Rule and Wage Rule will cause Superior to lose customers, goodwill, revenue, and expansion opportunities. According to Foley, Superior obtains many of its contracts through a bidding process and labor costs are among the most significant factors affecting the bid amount. Although Foley recognizes that the new rules create uncertainty about the costs associated with hiring H–2B workers, he states he is certain those costs will increase. Specifically, Foley observes that the 2015 Program Rule and

Wage Rule will require Superior to, inter alia, raise its employees' wages far above the actual market rate for work they perform. In order to compensate for the effects of the new rules, Foley explains that Superior will have two options—submit higher contract bids, in which case it will lose contracts, or opt not to pass on the additional costs, in which case it will lose money on the contracts it is awarded. Either way, according to Foley, Superior will be immediately and negatively impacted by the new rules, which ultimately could force it out of business. Finally, Foley asserts that DHS and DOL failed to provide advanced notice of the contents of the 2015 Program Rule and Wage Rule and refused to accept comments from interested parties, such as Superior. He claims that if Superior had been given the opportunity to explain to DHS and DOL the impact of the new rules on its business operations before they became effective, it would have done so.[8]

 The Court finds the foregoing declaration sufficient to show a cognizable injury to Superior. Foley's declaration establishes that as a current and future participant in the H–2B program, Superior will be immediately impacted by the requirements of the 2015 Program Rule and Wage Rule. It explains how the new rules will cause Superior's labor costs to rise, and claims that this rise in costs will financially harm Superior's bottom line. Further, it establishes that DHS and DOL's immediate implementation of the new rules denied Superior the opportunity for comment. Therefore, the Court finds that Foley's declaration, taken as true, is adequate to survive a summary judgment

---

**7.** As is explained infra, the Court finds that individual, corporate plaintiff Superior Forestry has standing. Therefore, the Court does not reach the question of whether National Hispanic Landscape Alliance, National Association of Landscape Professionals, and Small

and Seasonal Business Legal Center have associational standing.

**8.** Plaintiffs also submitted a substantially similar declaration prepared by James Allen, the owner and president of Bayou Lawn & Landscape Service.

challenge to Plaintiffs' standing.[9] *Cf. Horne*, 557 U.S. at 446, 129 S.Ct. 2579 (observing one that plaintiff's standing will permit other plaintiffs to remain in suit).

■ The Court next addresses the merits of Plaintiffs' remaining claims, beginning with their assertion that DHS and DOL violated the APA, 5 U.S.C. § 553, by promulgating the 2015 Program Rule without prior notice and comment. Specifically, Plaintiffs argue that DHS and DOL did not satisfy the APA's "good cause" exception to the requirement for prior notice and comment. They contend that DHS and DOL could have continued to run the H–2B program without the new rule under an already existing regulation, 8 C.F.R. § 214.2(h)(6)(iii)(B). They analogize the instant case to *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 800 (D.C.Cir.1983), and *United States v. Dean*, 604 F.3d 1275, 1280 (11th Cir.2010), which both addressed the APA's good-cause exception. In response, Defendants argue that good cause existed to skip the notice and comment process, because the prior rules governing the H–2B program had been invalidated by court rulings, and immediate implementation of the 2015 Program Rule was necessary to allow the program to continue to operate. They assert that disrupting the H–2B program while a new round of notice and comment was conducted would have caused severe hardship to the regulated community by cutting off a source of labor that many businesses depend on for their livelihood. Defendants also observe that the new rule is temporary, and that the public had the opportunity to submit over 800 comments in connection with a 2012 final rule that

covered virtually identical issues to those dealt with in the 2015 Program Rule. Defendants analogize the instant case to *Mid–Tex Electric Cooperative, Inc. v. Federal Energy Regulation Commission*, 822 F.2d 1123, 1124 (D.C.Cir.1987), *National Federation of Federal Employees v. Devine*, 671 F.2d 607, 608 (D.C.Cir.1982), and *American Federation of Government Employees, AFL–CIO v. Block*, 655 F.2d 1153, 1154 (D.C.Cir.1981), in which the courts held that there was good cause to promulgate a rule without notice and comment to prevent injury to the public.

■ The APA provides that an agency should provide a notice and comment period before promulgating new regulations in most circumstances. 5 U.S.C. § 553. The statute also permits, however, an agency to skip notice and comment "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." § 553(b)(3)(B). The good-cause exception is "an important safety valve to be used where delay would do real harm," but at the same time should be interpreted narrowly. *United States v. Dean*, 604 F.3d 1275, 1279 (11th Cir.2010) (quoting *U.S. Steel Corp. v. U.S. Envtl. Prot. Agency*, 595 F.2d 207, 214 (5th Cir. 1979)).

The Court finds good cause for DHS and DOL's decision to promulgate the 2015 Program Rule without notice and comment. The Court is persuaded by the cases cited by Defendants, which found good cause for an agency's decision to

---

9. On summary judgment, the Court must take the facts set forth in the Plaintiffs' declaration as true, *see Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, and "cannot decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone," *Bischoff v. Osceola Cnty,*

*Fla.*, 222 F.3d 874, 879 (11th Cir.2000). Defendants' avenue to undermine Plaintiffs' declaration would have been to come forth with contrary evidence, and to have that evidence weighed in a hearing or at trial, *see id.* but Defendants have not done this.

bypass notice and comment where the agency's prior regulations have been invalidated by court order, and immediate promulgation of new regulations is necessary to prevent harm to the public.

In *Mid-Tex Electric*, 822 F.2d at 1124, the court considered an interim rule that was promulgated by the Federal Energy Regulatory Commission ("FERC") without notice and comment after portions of a prior rule were invalidated. The court cited three factors in deciding that FERC had good cause to skip notice and comment. First, the court emphasized the rule's temporary and limited scope. *Id.* at 1132. Second, the court observed that the public had had a lengthy opportunity to comment on virtually the same issue in relation to a prior rule. *Id.* at 1133. Third, the court agreed with FERC's concern that the lack of a new rule would cause "regulatory confusion" and "irremedia[ble] financial consequences" for utilities and their customers, due to utilities' need for a regulatory framework governing infrastructure investment. *Id.* at 1133–34.

In *Devine*, 671 F.2d at 608, the court addressed an interim rule permitting the Director of the Offices of Personnel Management ("OPM") to postpone or cancel open enrollment season for federal employee health benefits after a court order called OPM's contracts with insurance providers into question. The court held that OPM had good cause to skip notice and comment, because the unsettled contract terms would have created substantial uncertainty for federal employees attempting to choose health insurance plans and threatened the stability of OPM's benefits program. *Id.* at 611.

In *Block*, 655 F.2d at 1154, the court considered regulations governing poultry slaughter inspections that were promulgated by the Department of Agriculture ("USDA") without notice and comment after a court order barred it from continuing to use existing informal guidelines governing inspections. The court held that USDA had good cause to skip notice and comment, because "the absence of specific and immediate guidance . . . would have forced reliance . . . upon antiquated [regulations], thereby creating confusion among [inspectors], and caused economic harm and disruption to" both poultry processors' ability to operate and consumers ability to purchase those processors' products.[10] *Id.* at 1157.

Similar to the exigent situations faced by the agencies in the foregoing cases, DHS and DOL explain that the 2015 Program Rule was published against the backdrop of litigation that had invalidated essentially all of DOL's regulations governing the issuance of temporary labor certifications for the H–2B program. *See* 80 Fed.Reg. at 24046–47; *see also Bayou I,* 713 F.3d 1080 (affirming preliminary injunction against DOL's 2012 H–2B rule); *Bayou II,* 81 F.Supp.3d 1291 (invalidating DOL's 2012 H–2B rule); *Bayou III,* Case No. 3:14–cv–00682–MCR–EMT (N.D.Fla. Mar. 4, 2015) (invalidating DOL's 2008 H–2B rule). Recent litigation had also cast serious doubt on DOL's ability to rely on subregulatory guidance documents to govern the labor certification process, as had been DOL's practice in years past. *See* 80 Fed.Reg. at 24047; *see also Comité de Apoyo a los Trabajadores Agrícolas v. Solis,* No. CIV.A 09–240, 2010 WL 3431761, at *19 (E.D.Pa. Aug. 30, 2010) (finding 2005 guidance letter establishing four tier wage structure was legislative rule that could not be published informally without complying with APA procedural

---

**10.** However, the *Block* court explained that the new rules were valid only as interim rules, pending notice and comment on a final version.

requirements); *Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C.Cir.2014) (same in re guidance document setting wage and housing requirements for H–2A certifications). In the absence of rules to govern the H–2B program, DOL's processing of labor certifications ground to a halt. *See* 80 Fed.Reg. at 24046–47. At the time of this shut-down, DOL had almost 800 labor certification applications representing over 16,000 workers pending. *See* 80 Fed.Reg. at 24046. DHS's ability to process H–2B visas faced imminent paralysis as well, because during this time DHS relied on DOL's certifications to carry out its own statutory duties under the H–2B program.[11] *See* 80 Fed.Reg. at 24046–47.

Tellingly, Plaintiffs themselves have highlighted the "significant economic harm" that would result from such a disruption of the H–2B program. In their declarations, Michael Foley of Superior Forestry and James Allen of Bayou Lawn & Landscaping Services stress that their businesses depend heavily on H–2B workers to meet their seasonal demand for labor, because they cannot find a sufficient number of United States workers to service their customers. As both Foley and Allen explain:

> [d]elays in obtaining certifications and visas for H–2B workers will result in serious harm to [our businesses], since we need these workers to begin on the date of need stated in the job order. . . . [I]f the H–2B workers do not arrive on time, we will not be able to meet our contractual duties to our clients and we will lose customers and good will.

Both Foley and Allen insist that without the H–2B program they would be forced to significantly cut back their operations, or even go out of business entirely.

DHS and DOL made the choice to promulgate the 2015 Program Rule immediately, rather than allowing the application process to stall while public notice and comment was conducted in advance of new regulations. By doing so, DHS and DOL were able to sidestep the very real harm that would have been suffered by businesses dependent on H–2B workers if their visa applications could no longer be processed. Like the courts in *Mid–Tex Electric Cooperative*, 822 F.2d at 1133–34, *Devine*, 671 F.2d at 611, and *Block*, 655 F.2d at 1157, the Court finds that the regulatory void caused by recent litigation, which threatened serious economic harm to the H–2B community, provided good cause for DHS and DOL's decision to forego notice and comment and implement the 2015 Program Rule immediately.[12] *See*

---

11. Plaintiffs' contention that DHS could have continued to process H–2B visa applications solely by reference to the standard outlined in 8 C.F.R. § 214.2(h)(6)(iii)(B) is untenable. Plaintiffs direct the Court to a single sentence, which provides that "[t]he petitioning employer shall consider available United States workers for the temporary services or labor, and shall offer terms and conditions of employment which are consistent with the nature of the occupation, activity, and industry in the United States." § 214.2(h)(6)(iii)(B). However, DHS has acknowledged for decades that it does not have sufficient expertise in labor markets to determine, for instance, whether there are available United States workers to fill proposed H–2B job opportunities. *See* 80 Fed.Reg. 24047. Therefore, pursuant to Congress's directive to consult with other agencies before issuing H–2B visas, 8 U.S.C. § 1184(c)(1), DHS relies on DOL's labor market expertise to make such determinations. And as explained *supra*, recent litigation had left DOL in no position to provide such guidance without new formal regulations.

12. Moreover, the Court observes that the 2015 Program Rule is an interim regulation drafted with the benefit of public comments submitted in relation to a substantially similar rule from 2012, 80 Fed.Reg. 24043, and that DHS and DOL have requested further comment from the public before making the 2015 Rule final, *see* 80 Fed.Reg. 24042. A rule's interim status and the fact that its policies

*Dean,* 604 F.3d at 1279 (explaining good-cause exception is "an important safety valve to be used where delay would do real harm" (quoting *U.S. Steel Corp.,* 595 F.2d at 214)).

Plaintiffs' cases fail to suggest otherwise. In *Action on Smoking,* 713 F.2d at 797, the court considered a regulation relaxing nonsmoking rules on aircraft that was promulgated by the Civil Aeronautics Board ("CAB") without notice and comment after a court invalidated a previous rule to the same effect. In finding that there was no good cause to skip notice and comment, the court emphasized that the rule "contain[ed] not a single word of explanation as to why new notice and comment proceedings are impracticable, unnecessary, or contrary to the public interest" as required by the APA. *Id.* at 800; *see also* § 553(b)(3)(B) (providing that agency must "incorporate[ ] the finding [of good cause] and a brief statement of reasons therefor in the rules issued"). Moreover, the court found that delaying the rule to allow for notice and comment would cause no real harm to the public. *Id.* at 801–02. Unlike the rule at issue in *Action on Smoking,* the 2015 Program Rule contains a lengthy discussion of why DHS and DOL believed they had good cause to skip notice and comment. *See* 80 Fed.Reg. 24047–50. Additionally, as explained supra, failure to promulgate the Rule immediately would have caused real harm to the public by cutting off a source of labor that many businesses depend on for their livelihood, including Bayou Lawn and Superior Forestry.

Curiously, Plaintiffs' cite to *Dean,* 604 F.3d at 1280, which actually supports Defendants' position. In *Dean,* 604 F.3d at 1277, the Eleventh Circuit addressed a regulation published without notice and comment that required certain convicted persons to register as sex offenders. The court found that there was good cause to skip notice and comment, because the rule eliminated uncertainty regarding who was required to register as a sex offender, *id.* at 1281, and most importantly, because it "reduced the risk of additional sexual assaults and sexual abuse by sex offenders by allowing federal authorities to apprehend and prosecute them," *id.* at 1282. Like in *Dean,* the 2015 Program Rule helped eliminate the uncertainty faced by H–2B visa applicants when essentially the entire regulatory structure governing DOL's labor certification process was invalidated in court. And again, by putting in place a new regulatory structure, the 2015 Program Rule prevented the harm to businesses that would have been caused by an extended shut-down of the H–2B program.

■■■ The Court moves next to Plaintiffs' position that DHS and DOL violated the APA by failing to allow for notice and comment before promulgating the 2015 Wage Rule. Specifically, Plaintiffs dispute DHS and DOL's assertion that they satisfied the APA's notice and comment requirement by accepting comments in response to an interim version of the rule promulgated in 2013. Plaintiffs argue that the comments from the 2013 Interim Rule are stale, and that DOL itself admitted that new comments were required. Plaintiffs cite to a "Notification of Status of the 2011 H–2B Wage Rule" published by DOL in 2014, and again direct the Court to *Action on Smoking,* 713 F.2d at 801. In response, Defendants explain that the 2015 Wage Rule is merely the finalized version of the 2013 Interim Rule, and that only the single round of comments on the interim version of the rule was required to satisfy the APA. Defendants cite *Federal Ex-*

---

have previously been the subject of public comment also weigh in favor of a finding of good cause. *See Mid–Tex Elec. Co-op.,* 822 F.2d at 1132–33.

press Corp. v. Mineta, 373 F.3d 112, 120 (D.C.Cir.2004), in support.

In Mineta, 373 F.3d at 114, the Department of Transportation ("DOT") had promulgated four cumulative and superseding regulations over the course of a year to establish formulas for compensating air carriers which had been forced to shutdown operations for several days in the wake of the September 11, 2011, terrorist attacks. Each of the four regulations was promulgated without prior notice and comment, but DOT nevertheless accepted after-the-fact comment on the first three. Id. The plaintiffs argued, inter alia, that the fourth regulation was invalid under the APA, because DOT failed to provide an opportunity for comment before the regulation was finalized. Id. at 120. The court found that the comments DOT accepted with respect to the first three regulations satisfied the APA's prior notice and comment requirement, because the first three regulations dealt with the same major issues of "the offset rule, the accounting presumptions, and the recoupment procedures" addressed in the fourth regulation. Id. Therefore, "interested persons, including the [plaintiffs], had three opportunities 'to comment on the [Fourth Final R]ule while it [wa]s still in the formative' stage." Id. (second and third alterations in original) (quoting Advocates for Highway & Auto Safety v. Fed. Highway Admin., 28 F.3d 1288, 1291 (D.C.Cir.1994)). The court also emphasized that the changes DOT made to the fourth regulation in response to the comments on the earlier versions showed that the public had been afforded a meaningful opportunity to participate in the rule-making process. Id.

The Court finds that the instant case is analogous to Mineta, because the public had a meaningful opportunity to comment on the major issues of the 2015 Wage Rule in response to the interim version of that rule promulgated in 2013. The H–2B program requires that employers offer wages to foreign workers which are equal to or greater than the "prevailing wage" for a particular occupation and in a particular geographic area in the United States. See, e.g., 76 Fed.Reg. at 3452. In 2013, DOL promulgated an interim regulation providing a revised methodology for calculating the prevailing wage, which allowed employers to use either: (1) the collective bargaining agreement ("CBA") wage rate if the job opportunity was covered by such an agreement; (2) the mean of the Occupational Employment Statistics ("OES") wage for the occupation in the area of intended employment; (3) the wage rate as determined by an employer provided survey; or (4) the wage rate under the Davis–Bacon Act ("DBA") or "McNamara–O'Hara Service Contract Act ("SCA"). See 78 FR 24053–56. Though they implemented the 2013 regulation immediately, DHS and DOL solicited public comments on each of these methods of calculating the prevailing wage, id., and received over 300 comments in response, 80 Fed.Reg. at 24149. The 2015 Wage Rule examines these comments at length in its discussion of the changes made from the wage methodology calculations in the 2013 Rule. See 80 Fed.Reg. at 24156–76 (discussing public comments in relation to decision to retain OES mean wage and CBA methods, limit use of employer survey method, and eliminate DBA and SCA methods). Like in Mineta, the Court finds that the public's ability to submit extensive comments on the interim rule in 2013, combined with DHS and DOL's careful consideration of those comments, shows that the public had a meaningful opportunity to participate in the rule-making process with respect to the 2015 Wage Rule. See 5 U.S.C. § 553(c) ("[T]he agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments....").

Plaintiffs' citation to *Action on Smoking*, 713 F.2d at 801, is inapposite. In *Action on Smoking*, the court found that CAB did not satisfy the APA's good-cause exception for skipping notice and comment in promulgating a new regulation by, inter alia, having accepted comments on a vacated regulation two to four years prior. *See id.* In this case, however, DHS and DOL did not actually invoke the APA's good-cause exception.[13] *See* 80 Fed.Reg. at 24153 n.17. Instead, as the Court has explained, DHS and DOL promulgated an interim rule in 2013, accepted public comments on it, and then finalized the rule in 2015.

Finally, the Court is not persuaded by Plaintiffs' argument that the 2013 comments are stale. Plaintiffs cite to a "Notification of Status of the 2011 H–2B Wage Rule" published in 2014, which states that "DOL has determined that recent developments in the H–2B program require consideration of the comments submitted in connection with the 2013 [interim final rule], and that further notice and comment is appropriate." *Wage Methodology for the Temporary Non–Agricultural Employment H–2B Program*, 79 Fed.Reg. 14450, 14453 (Mar. 14, 2014). Plaintiffs assert that this document is an admission by DOL that in light of new evidence, a new round of notice and comment was required before finalizing the 2015 Wage Rule. However, Plaintiffs take this quote out of context. The foregoing quote refers to the status of a proposed wage rule that was published by DHS and DOL in 2011. 79 Fed.Reg. at 14452. Shortly before the 2011 Rule was to become effective, Congress blocked it through a series of appropriations bills that prevented DOL from expending any funds to implement it. *Id.* When the funding bar was finally lifted in 2014, DHS and DOL published the forgo-

ing Notification of Status to inform the public that it intended to publish a proposed wage rule "working off the 2011 Wage Rule as a starting point." 79 Fed. Reg. 14450. Due to ongoing litigation, however, DHS and DOL ultimately decided to abandon their plan to update the 2011 Rule. *See* 80 Fed.Reg. at 24151. Instead, DHS and DOL chose to finalize the 2013 Interim Wage Rule, which had been promulgated while the appropriations block was place. 80 Fed.Reg. at 24151. Because DHS and DOL's plan to update the 2011 Rule never got off the ground, a new round of comments was never initiated. Moreover, the "recent developments in the H–2B program" to which Plaintiffs' quote refers are simply the promulgation of the 2013 Interim Rule and Congress's decision to lift the funding ban on the 2011 Rule. As Plaintiffs have failed to point to any other notable developments that came to light between the 2013 Interim Rule and the 2015 Wage Rule, the Court will not simply presume that new information rendered the comments submitted in connection with the 2013 Rule stale.

The Court moves next to Plaintiffs' argument regarding the 2015 Program Rule and Wage Rule's provision for administering the H–2B program in a way that does not "adversely affect" United States workers. Plaintiffs argue that considering adverse effect impermissibly alters Congress's statutory scheme for the H–2B program, because Congress explicitly provided that DHS and DOL should consider this factor in regard to H–2A visas, 8 U.S.C. § 1188(a)(1)(B), but did not include a similar provision with respect to the H–2B visas. In response, Defendants argue that DHS has broad discretion to prescribe the conditions governing admission

---

**13.** DHS and DOL did, however, rely on a separate "good cause" exception to implement the Rule without observing the usual thirty-day waiting period, pursuant to 5 U.S.C. 553(d)(3). *See* 80 Fed.Reg. at 24152–53. Plaintiffs do not challenge this action.

of foreign workers under the H–2B program, including Congress's directive that H–2B workers be admitted only "if unemployed persons capable of performing such [work] cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). According to Defendants, considering whether admitting H–2B workers adversely affects United States workers is a logical outgrowth of this discretion. They also insist that the no-adverse-effect requirement is consistent with the legislative history of the H–2B program, and point out that Congress has had ample opportunity to overrule this requirement, but has never done so.

■■■■■ Congress has vested DHS with broad authority to regulate the admission of nonimmigrant aliens under INA and IRCA. *See* INA, 8 U.S.C. § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as [DHS] may by regulations prescribe ...."); IRCA, 8 U.S.C. § 1103(a) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of [the H–2B visa statute] .... [and] shall establish such regulations ... as he deems necessary for carrying out [t]his authority...."). Therefore, DHS's "judgment that a particular regulation fits within this statutory constraint must be given considerable weight." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). With that said, the "regulation cannot stand if it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694

(1984)); *see also* 5 U.S.C. § 706(2)(A) (instructing courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").[14] To determine whether the regulation is a valid exercise of DHS's authority, the Court must consult the INA and IRCA, "viewing [them] as a 'symmetrical and coherent' statutory scheme." *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).

The statutory framework specific to the H–2B program is sparse. When Congress bifurcated the H–2 visa program in the mid–1980s to create the H–2A and H–2B classifications, almost all of its attention was directed toward defining the contours of the H–2A program for temporary agricultural workers. IRCA, Pub. L. No. 99–603, § 216, 100 Stat 3359 (codified as amended at 8 U.S.C. § 1188). The new legislation specifically defined DHS and DOL's roles under the H–2A program, made DOL's labor certifications mandatory, and laid out the conditions under which such a certification would be granted. *Id.* In regard to the H–2B program for temporary non-agricultural workers, however, Congress left in place the same limited provision that had governed the H–2 program from its outset under the INA in 1952. The legislation defined an H–2B worker as simply an alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in

14. Plaintiffs and Defendants alternately cite to cases applying the *Chevron* doctrine and APA review in their arguments concerning DHS's no-adverse-effect requirement. Under either standard, however, the analysis would be the same, as the second step of *Chevron* is the functional equivalent of arbitrary or capricious review under the APA. *See Judulang v. Holder*, — U.S. —, 132 S.Ct. 476, 484 n. 7, 181 L.Ed.2d 449 (2011); *Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 865 n. 23 (11th Cir.2016).

this country." IRCA, Pub. L. No. 99–603, § 301(a), 100 Stat. 3359, (codified as amended at 8 U.S.C. § 1101(a)(15)(H)(ii)(b)); *see also* INA, Pub.L. No 414, 66 Stat. 163 (defining H–2 worker identically).

■■■■ It is clear from this limited provision that Congress intended that the H–2B visa program should not be used to hire foreign workers at the expense of U.S workers. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b) (providing H–2B workers may be admitted only "if unemployed persons capable of performing such [work] cannot be found in this country"). What is unclear, however, is how exactly DHS is meant to carry out this directive. *Cf. United States v. Haggar Apparel Co.,* 526 U.S. 380, 393, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) (observing that for purposes of *Chevron*, a statute is ambiguous if an agency must use its discretion to determine how best to implement the statute's policy in those cases not covered by the statute's specific terms). Filling such gaps involves difficult policy choices on the part of an agency. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). When Congress leaves such a gap, courts presume that Congress "understood that the [gap] would be resolved, first and foremost, by the agency." *City of Arlington, Tex. v. F.C.C.,* — U.S. ——, ——, 133 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013).

DHS has carried out its directive to ensure that foreign H–2B workers are not hired at the expense of United States workers by consulting with DOL on the matter of domestic labor market conditions. *See* 80 Fed.Reg. at 24044; *see also* 8 U.S.C. § 1184(c)(1) (directing DHS to consult with "consult[ ] with appropriate agencies of the Government before granting H–2B petitions"). In doing so, DHS has required DOL to answer two questions. First, DOL must determine whether "[t]here are not sufficient U.S. workers who are qualified and who will be available to perform the temporary services or labor for which an employer desires to import foreign workers." 20 C.F.R. § 655.1(a)(1). Second, DOL must determine whether "[t]he employment of the H–2B worker(s) will . . . adversely affect the wages and working conditions of U.S. workers similarly employed." 20 C.F.R. § 655.1(a)(2).

■■■ The Court finds that considering whether the importation of H–2B workers will adversely affect United States workers is not arbitrary, capricious, or manifestly contrary to Congress's directive that foreign workers be imported only "if unemployed persons capable of performing [H–2B jobs] cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). First, this consideration is consistent with the H–2 program's long statutory history. The House Report on the IRCA, which first created the H–2B category, explains:

> The H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's. The essential objective of the program, which the bill does not change, is to permit employers to utilize temporary foreign worker if domestic workers cannot be found and if it can be shown that the use of such foreign labor would not adversely affect the wages and working conditions of domestic workers similarly employed.

H.R. REP. 99–682, 50–51, 1986 U.S.C.C.A.N. 5649, 5654–55; *see also Haggar Apparel,* 526 U.S. at 392, 119 S.Ct. 1392 (observing that courts may consider whether agency interpretation is consistent with Congressional intent or purpose underlying statute). Second, H–2 regulations have contained a no-adverse-effect requirement since at least 1968, and Congress has never seen fit to abrogate them. *See* 33 Fed.Reg. 7570 (May 20, 1968);

*Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act*, 55 FR 2606, 2617 (Jan. 26, 1990); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (stating that courts may consider whether Congress was aware of agency's interpretation and refrained from acting to revise or repeal it). Third, considering adverse effect is consistent with the common-sense and "often-recognized" principle that "a primary purpose in restricting immigration is to preserve jobs for American workers." [15] *Reno v. Flores*, 507 U.S. 292, 334, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (*I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991)); *Sure–Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 893, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1294, n. 6 (11th Cir.2006). Given DHS's broad authority "to establish such regulations . . . as [it] deems necessary for carrying out" the H–2B program, 8 U.S.C. § 1103(a), and the sparsity of the relevant statutory framework, the Court finds that considering whether admitting H–2B workers will adversely affect United States workers does not impermissibly alter Congress's statutory scheme for the H–2B program. Instead, this consideration is a reasonable outgrowth of Congress's directive to admit H–2B workers only "if unemployed persons capable of performing [H–2B jobs] cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

▮ Finally, the Court addresses Plaintiffs' contention that the 2015 Program Rule and Wage Rule implement the no-adverse-effect requirement in an arbitrary and capricious manner. Plaintiffs argue that whether granting a particular H–2B visa will adversely affect United States workers must be determined on a case by case basis, and cannot reasonably be tied to "per se" rules such as the 2015 Program Rule's prevailing wage formula.[16]

---

**15.** The Court also observes that considering foreign workers' impact on United States workers' wages and working conditions prevents employers from abusing the H–2B program to obtain cheap foreign labor at the expense of hiring United States workers who would otherwise be available for hire. For instance, if DHS and DOL could not consider the adverse effect on United States wages, there would be little to prevent employers from artificially lowering wage rates to disincentivize domestic job applicants, then exploiting the absence of applicants to import H–2B workers who are willing to work for submarket wages. Thus, considering adverse effect prevents the H–2B program from distorting domestic labor markets. As the 2015 Wage Rule explains:

A basic principle of supply-and-demand theory in economics is that in market economies, shortages signal that adjustments should be made to maintain equilibrium. Therefore, if employers experience a shortage of available workers in a particular region or occupation, compensation should rise as needed to attract workers. Market signals such as labor shortages that would normally drive wages up may become distorted by the availability of foreign workers for certain occupations, thus preventing the optimal allocation of labor in the market and dampening increased compensation that should result from the shortage. In enacting the foreign worker programs, generally, Congress has recognized the potential for market distortion by requiring in labor certification programs generally that the availability of foreign workers must not adversely affect the wages and working conditions of U.S. workers. See, e.g., 8 U.S.C. 1182(a)(5)(A)(i)(II), INA section 212(a)(5)(A)(i)(II); 8 U.S.C. 1188(a)(1)(B), INA section 218(a)(1)(B). In its long-standing regulations, DHS has required this showing for the H–2B program. See, e.g., 8 CFR 214.2(h)(6)(iii)(A).

80 Fed.Reg. 24158–59.

**16.** Plaintiffs also attack the 2015 Program Rule and Wage Rule's "three-fourths guarantee," which requires employers to offer its H–2B workers employment for at least three fourths of the workdays in each 12–week period. However, issues are ripe for judicial re-

Plaintiffs assert that "[r]ather than assessing whether a particular wage offer will cause adverse effect, DHS now requires H–2B employers in the top five H–2B industries to offer a wage equal to the 60th percentile of the market wage," and that "[i]f an employer offers a wage even a dime below the 60th percentile, it will not receive certification." Plaintiffs cite *Ragsdale*, 535 U.S. at 93, 122 S.Ct. 1155, in support of their position. In response, Defendants state that Plaintiffs fundamentally misinterpret the prevailing wage formula.

The Court agrees with Defendants that Plaintiffs appear to misunderstand DHS and DOL's comments about the prevailing wage formula's relationship to the "60th percentile of the market wage." The actual paragraph from the 2015 Program Rule that Plaintiffs cite to reads as follows:

The prevailing wage calculation represents a typical worker's wage for a given type of work. The prevailing wage calculation is based on the current wages received by all workers in the occupation and area of intended employment. Based on OES data, DOL estimated that the weighted mean wage for the top five occupations in the H–2B program reflects approximately the 60th percentile of the wage distribution of those occupations. Therefore, it is reasonable to assume that 40 percent of the corresponding workforce earns a wage that is equal to or greater than the calculated prevailing wage. Conversely, it would be reasonable to assume that 60 percent of the workers in corresponding employment earn less than the prevailing wage and would have their wages increased as a result of the interim final rule. Applying this rate to DOL's estimate of the number of workers covered by the corresponding employment provision would mean that the number of newly covered workers who would receive a wage increase is between 7,700 and 23,100.

80 Fed.Reg. 24094–05 (footnotes omitted). As is evident from the foregoing excerpt, there is no "per se" rule that "[i]f an employer offers a wage even a dime below the 60th percentile, it will not receive certification." DHS and DOL were merely commenting on what they anticipated would be the approximate effect of the prevailing wage formula on the wages of workers within certain industries.

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 24, is **GRANTED**, and Plaintiffs' Motion for Summary Judgment, ECF No. 21, is **DENIED**. Defendants' Motion to Strike, or in the Alternative, For Leave to File a Response to Plaintiffs' Notice of Supplemental Authority, ECF No. 32, is **DENIED**, and Plaintiffs' Status Report and Request to Expedite, ECF No. 34, is **DE-**

view only if "a plaintiff ... show[s] he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir.2005) (alteration in original) (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir.1991)). "One of the 'basic rationale[s]' for the ripeness doctrine is 'to protect the [administrative] agencies from judicial interference until an administrative decision['s] ... effects [are] felt in a concrete way by the challenging parties.'" *Id.* (first alteration in original) (quoting *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 590 (11th Cir.1997)). The Department of Labor Appropriations Act, 2016, Pub. L. 114–113, § 113, has barred DOL from expending any funds to enforce the three-fourths guarantee. Unlike other requirements under the challenged regulations, which are already being enforced, the appropriations block makes it uncertain whether the three-fourths guarantee will ever effect Superior Forestry or Bayou Lawn. *Cf.* 80 Fed.Reg. at 24151–52 (recounting history of 2011 H–2B regulations, which were never implemented due to Congress's sustained appropriations block). Thus, the Court finds that this claim is not ripe for review.

**NIED** as moot. The Clerk of Court is directed to enter final summary judgment in favor of Defendants and against Plaintiffs. The Clerk is also directed to tax costs against Plaintiffs and to close the file.